# THE COLORADO LAW REPORTER.

VOL. IV.]            DENVER, SEPT. 6, 1883.            [NO. 1.

## JAMES JONES v. THE PEOPLE.

*(Supreme Court of Colorado, December Term, 1882—Error to District Court of Clear Creek County).*

1. COMPETENCY OF JUROR. When conscientious scruples will prevent juror from rendering verdict according to law and evidence, he is incompetent. When a juror states he has partially formed an opinion and does not know but "what he has some bias," and upon further examination answers that "he knew no reason why he could not render a fair and impartial verdict, according to law and evidence, without prejudice or bias, regardless of what he has heard," he is competent. The question whether juror has such an opinion as that it would require evidence to remove it, is no certain or proper test of juror's qualifications.

2. EVIDENCE AS TO CHARACTER. Evidence of a quarrelsome and violent disposition is for purpose of showing ground for belief in mind of slayer that an attack made upon him was dangerous and felonious, and must be connected with the status of defendant at the time.

3. INSTRUCTIONS. If the instructions of the Court in regard to the degrees of crime do not prejudice defendant, there is no error.

4. USE OF INTOXICATING LIQUORS BY JURORS. To set aside a verdict for this reason it must be shown that by such misconduct of a juror a party on trial has been prejudiced.

STONE, J. Plaintiff in error was indicted and tried for murder. The verdict of guilty being without the clause involving the death penalty, the sentence imposed was imprisonment for life. The entire bill of exceptions is printed, setting out all the testimony and proceedings in the case, and we have carefully read and examined the whole 200 pages of printed record, with a view of doing justice as well to the prisoner as to his counsel, who have exhibited commendable pains in presenting the case for review in this Court. The errors assigned are stated as follows:

1. The Court erred in sustaining challenge to James Powell, as juror.

2.   The Court erred in overruling challenge to Hans Iverson, as juror.

3.   The Court erred in excluding the offer to prove character of deceased.

4.   The Court erred in refusing defendant's instructions numbered 7, 8 and 11, upon the question of degree.

5.   The Court erred in refusing defendant's instructions numbered 9 and 10, upon the question of intent.

6.   The Court erred in giving its instructions numbered 7 and 6, upon the question of intent.

7.   The Court erred in giving its instruction numbered 14.

8.   The Court erred in giving its instruction numbered 15.

9.   The Court erred in its entire charge taken as a whole.

10.   The Court erred in refusing to grant a new trial.

11.   The evidence does not justify any verdict higher than manslaughter.

12.   The misconduct of the jury in the use of intoxicating liquor vitiated the trial and verdict.

13.   The misconduct of the jury in visiting the theatre vitiated the trial and verdict.

14.   The Court in its charge confounds the distinction between manslaughter and murder, with the distinctions relative to punishment which the jury were at liberty to make.

*First*—The challenge by the prosecuting attorney of the juror Powell was on the ground of his expressed conscientious scruples against the infliction of the death penalty. Upon his *voir dire* examination the juror stated distinctly his unwillingness and inability to join in a verdict that would subject the convicted to the death penalty. Upon cross-examination he was asked this question: "Did you say that if the evidence in this case, and the law, as it should be given to you by the Court, should warrant you in rendering a verdict which would result in the death of the prisoner, that your conscientious scruples are such that you could not render such a verdict?" To which question the juror answered: "I would not render such a verdict." This was, in effect, declaring that he would not assent to a verdict in accordance with the laws of the land and his oath as a juror, where the law entailed a penalty which his individual conscience did not approve. It is needless to say that the law

could not be fully administered with such a juror sitting in the case, and there was no error in sustaining the challenge.

*Second*—The juror Hans Iverson stated that he had heard something about the case, and had "partially" formed an opinion about it; that he did not know but what he had some bias in the case. Upon further examination he stated that he knew of no reason why he could not render a fair and impartial verdict according to the law and evidence submitted, without any prejudice or bias, regardless of what he had previously heard. In answer to the question by counsel for defendant, "Would the opinion you have formed as to the guilt or innocence of the prisoner require evidence to remove it?" the juror answered, "Yes, sir;" whereupon he was challenged for cause by defendant.

In answer to further questions by the Court, the juror stated that he had no settled opinion; that he did not hear about the case at Silver Plume (where the homicide occurred), but at Idaho Springs; that the persons he got his information from learned it from reports; that he did not inquire into the matter, and that he could lay aside the opinion he might have formed about the case; and as his duty to his oath, could try the case the same as if he had never heard of it.

The question, whether a juror has such an opinion as that it would require evidence to remove it, is one quite commonly propounded by attorneys, but is no certain or proper test of such juror's qualification. I suppose that no rational person ever has an opinion upon any subject which is changed or removed except by evidence of some kind. I do not refer to sworn testimony alone, heard upon a trial, for the question is not thus limited, and is misleading to the ordinary juror thus questioned.

The time has gone by, if it ever existed, when a juror is held to be disqualified merely because he has heard or read something about the case he is called to try, and is intelligent enough to have formed an opinion therefrom. The proper test in such case is, can and will the juror render a verdict according to the evidence heard upon the trial, impartially and fairly, under his oath so to do, regardless of his peconceived opinions; and if the juror declares upon his *voir dire* oath that

he can and will so decide, there is no cause for sustaining a challenge on the ground of such preconceived opinion.

The juror in question had no fixed opinion; he had heard mere rumors at a distance from the place where the homicide occurred; he did not inquire into the matter, and he declared, as well he might, his willingness and ability to decide freely and fairly, uninfluenced by what he had previously heard, read or believed, respecting the guilt or innocence of the prisoner.

We have a statute upon this subject, under which a juror is not disqualified by reason of a previously formed or expressed opinion, if the Court shall be satisfied upon examination that he will render an impartial verdict (G. L., 872); and for a full discussion of this whole question, by Chief Justice Hallett, see the case of *Solander* v. *The People,* 2 Colo., 48.

There was, therefore, no error in overruling the challenge.

*Third*—The third assignment questions the ruling of the Court in refusing the offer of the defense to show that the deceased was of a quarrelsome and violent disposition when under the influence of liquor, in which condition he was shown to be at the time of the killing. We think the offer was properly refused. No foundation had been laid for the introduction of such testimony. The testimony shows that up to the day of the killing there had been no quarrel between the prisoner and the deceased; their relations had always been friendly; they had roomed together, and there was no evidence that the prisoner, at the time of the killing, had anything to fear from the known disposition or character of the deceased, or from any previous threats, conduct or circumstance whatever. A few minutes previous to the killing the deceased was looking for a pair of boots in the house, and, not finding them, stepped to the door and asked the prisoner about them; the search was renewed, the prisoner, who was unloading sacks of ore from the backs of donkeys at the door, entered the house to help look for the boots; the deceased found them just after the prisoner entered, and then said to prisoner, "I take back what I said about the boots." Prisoner resumed his work outside, and deceased, who was then packing a valise just inside the open door, made some remarks about the boots in talking with

a little child beside him; prisoner, overhearing the remarks, said, "what are you saying about the boots?" deceased replied, "I am talking with Edith," (the child). The prisoner then said, "if you want anything off of me, just come out here." The deceased thereupon rose up and walked rapidly out the door towards the prisoner, who was then about a dozen feet distant, when, without another word uttered by either, the prisoner gave deceased a push or thrust with his hand, in which he held an open jack-knife which he was using in cutting the pack ropes, and the deceased fell backwards into the doorway, and died without speaking a word. The prisoner, in his own testimony to the jury, states that the deceased first struck him on the neck with his fist; a statement to the same effect is made by the witness Clair on behalf of the defendant, but the testimony of this witness is, we think, fairly impeached by a number of witnesses introduced for that purpose. Upon these facts it will be seen that the testimony as to the character of the deceased was clearly inadmissible at the time it was offered, which was previous to the testimony of Clair and the defendant. Such testimony, when admitted, is for the purpose of showing ground for belief in the mind of the slayer that an attack made upon him was dangerous and felonious.

Hence, as a proper ground for the introduction of such testimony, an attack must first be shown, the nature of which, together with the known violent and dangerous character of the attacking party, is sufficient ground for belief in the mind of the defendant at the time that the attack is felonious. *Davidson* v. *The People*, 4 Colo., 145.

Mr. Wharton lays it down that if the offer of such testimony is general, and not connected with the *status* of the defendant at the time, the testimony must necessarily be excluded, for B's savage disposition is no reason for A's killing him. "When, however, it is clearly shown that the defendant was under a reasonable fear of his life from the deceased, then the deceased's temper, in connection with previous threats, etc., is sufficiently a part of the *res gestæ* to go in evidence as explanatory of the state of defense in which the defendant placed himself." Wharton Cr. L., Sec. 641.

The prisoner in this case had voluntarily invited an attack,

and the deceased's going out upon this invitation, unarmed, as the testimony shows he was at the time, was not such an attack as to make the offered testimony admissible under the rule.

*Fourth*—The fourth, fifth, sixth, seventh, eighth and ninth assignments, relate to instructions to the jury, given and refused, and do not require notice in detail, but may be considered together, since the counsel for plaintiff in error fails to discuss any one specifically, or to point out the particular errors relied upon.

The general fault which seems to be charged to the instructions is, that the Court did not clearly instruct the jury respecting the degree of the homicide; first, as to the distinction between the degree involving the death penalty, and that punishable by imprisonment for life; and, second, as to the distinction between murder and manslaughter.

As to the first point, since the verdict of the jury did not involve the death penalty, we cannot perceive any ground of complaint in the instructions relating to the degrees of murder.

There were thirty separate instructions given by the Court to the jury, and with such a number we cannot set out and review them, or any part of them, under a vague and general charge of error, dependent, as the most of them are, to some extent, upon each other. It is sufficient to say that the instructions are full and fair to the defendant, and that, while stating the law correctly, some of them go to the extreme limit of the rule in favor of the defendant. Under the instructions given, the jury might have found a verdict of manslaughter only, if they had believed the evidence failed to show malice in the homicide, or if they had entertained a reasonable doubt upon this point.

The eleventh assignment goes to the sufficiency of the evidence to warrant a higher verdict than manslaughter. This was a question of fact for the jury, and a careful examination of all the evidence in the case as set out in the record, leads us to the conclusion that the evidence fairly supports the verdict.

*Fifth*—The twelfth instruction is based on the misconduct of the jury in the use of intoxicating liquors.

Upon the filing of affidavits upon this point in the Court below, a thorough investigation was ordered and had by the Court, and the testimony of jurors and others heard upon the whole matter. From this testimony it appears that during the progress of the trial, the jury, or some of them, at their own expense procured and had sent to their room about two quarts of whisky, of which several of the jurors drank, but no considerable quantity was drank by any one. That several of them were accustomed to taking a dram every morning, and that it was procured on this occasion without any thought of harm or legal consequences arising from its use. The testimony of the jurors examined, as well as that of the bailiff in charge, was that no one was intoxicated in the least, but that, on the contrary, every juror on the panel was perfectly sober at all times during the trial; and that neither their deliberations nor verdict were influenced or affected in the least by the use of the liquor that was partaken of.

Whether the use of intoxicating liquor by any one or more of a jury is sufficient cause for setting aside a verdict rendered by such a jury, has given rise to a contrariety of opinion by the Courts. This difference seems to depend much upon differences of time in local history, and somewhat upon differences in local prevailing sentiment. Under the English common law in early times, juries were treated with a rigor which is unknown in modern practice, and would not be tolerated if attempted. Jurors were confined in rooms like prisoners, there "to be kept without meat, drink, fire or candle, unless by permission of the Judge, until they are all unanimously agreed." (Blackstone Com., Book 3, 375). And if the jurors did not agree before the Judges were ready to leave the town and go to another, the jurors were not discharged, but were "carried around the circuit from town to town in a cart." *Ibid.*

The time when the discomfort, if not torture, of jurors was considered essential to securing just and speedy verdicts, has long gone by. As to the use of liquors, the English authorities seem to hold that if the drink is not at the expense of the prevailing party litigant in the case, the verdict is not necessarily vitiated. The early cases in New York, and particularly

the case of *Douglas* v. *The People*, 4 Cow., 36, laid down the doctrine that the use of intoxicating liquors to any extent, vitiated the verdict.

This case was followed by the early Courts of several other States, including Arkansas and Texas, but the doctrine of these cases was overruled by the Supreme Court of New York in the case of *Wilson* v. *Abrahams*, 1 Hill, 207. The cases which now hold most strongly to the doctrine laid down in *Douglas* v. *The People, supra,* are the Iowa cases. In the case of *The State* v. *Baldy,* 17 Iowa, 39, the Court set aside the verdict on the sole ground that after the jury had retired in charge of the bailiff, one of the jurors, who was permitted to separate from the others for a necessary purpose, went into a grocery store for some tobacco, and while in there drank "a glass of ale or lager beer," and immediately returned to the jury room. There was no evidence that the juror was in any way affected by this one glass of beer any more than by the tobacco which at the same time he was permitted to get and use; but the Court, *per* Cole, J., in the opinion denominated it "spirituous drink," and declares that the use of such liquors "in any degree," is in itself "conclusive evidence" that the party on trial "has been prejudiced." This decision is based chiefly on that of *Douglas* v. *The People,* and is followed by the case of *Ryan* v. *Harrow,* 27 Iowa, 494, notwithstanding that in the latter case it is admitted that *Wilson* v. *Abrahams* overrules all the former New York decisions to the contrary, including that of *Douglas* v. *The People.*

The doctrine of these Iowa cases is opposed, not only to the great weight of authority, as will be seen by the authorities hereafter cited, but, as we think, opposed to sound reasoning. It must be borne in mind that the question we are to deal with has nothing to do with the moral or social questions involved in the use of intoxicating liquors. If a verdict is to be set aside for misconduct of the jury, it must be for legal reasons alone.

If, by such misconduct, a party litigant, or, in a criminal case, a party on trial has been prejudiced, the verdict should be set aside, for the law requires a fair and impartial verdict. If the justness, soundness or fairness of the verdict has been

impaired or in any way vitiated by the use of liquors by the jury, such verdict should be set aside. But if no such consequences be shown or are fairly inferable; if no juror was intoxicated or in any manner or degree affected in his deliberations or judgment, for what reason, in such case, is the verdict to be set aside? How has the party on trial in such case been prejudiced or injured? The real question in the case is, has the party, to be affected by the verdict, been prejudiced by the conduct or misconduct of the jury?

The general rule, as stated by Mr. Wharton in his work on Criminal Law, Sec. 3111, is, that "the verdict will not be set aside on account of the misconduct or irregularity of a jury, even in a capital case, unless it be such as might affect their impartiality, or disqualify them from the proper exercise of their functions." In the case at bar it not only does not appear that the misconduct complained of disqualified any juror in the porper exercise of his functions in the least, or in any degree whatever impaired the correctness or justness of the verdict; but on the contrary, the testimony to the point clearly contradicts even a presumption against the verdict. But it is said on the other hand that the only safety lies in the rigid rule of setting aside the verdict in every case where intoxicating liquors are used by the jury, regardless of whether the jury were affected by such use or not. We cannot assent to this proposition. Would such a rule prevent the repetition of like misconduct by future juries? We say, no. And instead of safety, there is manifest danger in this rule, for it would hold out an obvious temptation, and furnish an almost certain opportunity to secure a new trial in every case, by the surreptitious introduction of liquor into a jury room, and would tend to lessen the certainty of conviction in every criminal case.

Such misconduct on the part of the jury certainly deserves condemnation and punishment, and the jurors who procured and drank the liquor in this case were severely censured, and likewise fined by the Court; but this is a matter entirely apart from the question of setting aside the verdict when its fairness is not impeached.

We cite the following authorities in support of the views

we have expressed upon this question:   *State* v. *Cucuel*, 31 N. J., 250; *Wilson* v. *Abrahams*, 1 Hill, 207; *Commonwealth* v. *Roby*, 12 Pick., 496; *Gilmanton* v. *Howe*, 38 N. H., 108; *Rowe* v. *The State*, 11 Humph., 492; *Purinton* v. *Humphreys*, 6 Me., 379; *State* v. *Upton*, 20 Mo., 397; *Thompson's Case*, 8 Gratt., 657; *Davis* v. *The People*, 19 Ill., 74; *Roman* v. *The State*, 41 Wis., 312; *Westmoreland* v. *The State*, 45 Geo., 282; *Kee* v. *The State*, 28 Ark., 165; *Richardson* v. *Jones*, 1 Nev., 405; *United States* v. *Gibert*, 2 Sumner, U. S. C. C., 83; 3 Wharton Cr. L., Sec. 3320.

*Sixth*—The thirteenth assignment is predicated upon the alleged misconduct of the jury in attending the theater.   The facts upon this point established by the testimony of the officer in charge of the jury upon this occasion, as well as the testimony of a number of the jurors themselves, are, that on the evening of the day they were empaneled, the entire jury in charge of a sworn officer of the Court, attended a theatrical play at a Hall or Opera House in Georgetown where the Court was sitting; that they occupied seats especially engaged for them in a body; that no one occupied these seats but the jurors and the officer in charge; that they did not separate either while there or in going to and from the place, and held no conversation or communication with any one, except between themselves and the officer; that no other spectators at the theater mingled with them; that they were all the time while there, as well as going and coming, in charge of said officer, and that they so attended the theater by permission of the Judge of the Court trying the case.   These facts were not contradicted in any particular.   The record is silent as to the literary or moral character of the play, whether tragic, comic, or sentimental; but we think it entitled to a presumption favorable rather than unfavorable to its quality.   Since the jury were allowed this recreation by the Court, and were not separated or communicated with by any one outside their body and the officer in charge, we cannot say that it was misconduct, or conduct by which the prisoner was in any way prejudiced; and the same rule which we have laid down in discussing the preceeding assignment of error, must be applied to this, to wit: that where it does not appear that the acts complained of have affected the jury in the full and impartial discharge of their

duties in trying the case and rendering a just and true verdict therein, there is no sufficient cause for holding the verdict thereby vitiated, or for such reason setting it aside. *State* v. *Cucuel, supra.*

We are not to be understood as approving the practice of an indulgence to juries such as was granted here; on the contrary, such a relaxation as a rule is not to be countenanced, but in this particular instance there was doubtless sufficient reason to the Court for the act, and since it appears to have been harmless, we cannot hold that there was error in the refusal of the Court to set aside the verdict upon this ground.

The fourteenth assignment of error is sufficiently covered by what we have said in noticing the instructions of the Court to the jury.

Perceiving no error in the record, the judgment will be affirmed.

[Mr. Chief Justice BECK, before whom, as then District Judge, the case was tried in the Court below, took no part in this decision.]

*Morrison & Fillius,* and *B. M. Hughes,* for plaintiff in error.

*D. F. Urmy,* Attorney General, for the People.