APRIL TERM, 1885.

## May v. The People.

1. The provisions of the statute (Gen. Stats. sec. 1077) touching the duty of the clerk of the district court to adjourn the court, in the absence of the judge on the first day of the term, are directory, and the object to be accomplished thereby is solely to prevent a lapse of the term otherwise occasioned by the absence of the judge during the first week of such term.

2. When the evidence fairly sustains the verdict, it will not be disturbed.

3. Where instructions are given to the jury fully embracing everything contained in an instruction refused, and which it was proper for the court to give, the verdict will not be disturbed.

4. The refusal of the court to allow the defendant on an indictment for murder to show the reputation of the deceased for violence in a foreign country, *held* not to be error.

5. The general rule is that a verdict will not be set aside on account of inadvertent irregularity on the part of the jury, even in a capital case, unless it be such as might affect their impartiality or disqualify them for the exercise of their functions. The controlling question in all such cases is: Was the defendant prejudiced by the alleged misconduct of the jury?

*Error to District Court of Clear Creek County.*

The facts are fully stated in the opinion.

Mr. R. S. Morrison, for plaintiff in error.

Attorney-General D. F. Urmy, for defendant in error.

Stone, J. The plaintiff in error was convicted of murder in the second degree under the statute, or upon a verdict not indicating that the killing was premeditated so as to involve the death penalty, and was accordingly sentenced to the penitentiary for life. Some of the questions raised by the assignment of errors are similar to the principal questions presented in the case of *Jones*

*v. The People*, 6 Colo. 452. As to those questions, the decision in the case referred to obviates the necessity for extended discussion here.

The first question presented, however, is a novel one, relating to jurisdiction of the court below to transact any business at the particular term at which this case was tried. It is assigned for error that there was a lapse of the term at which this trial was had. The indictment on which the plaintiff in error was tried was found at the August term, 1877, and the trial was had at the January term, 1878. The term began, by law, on the first Tuesday in January, which day happened that year to fall upon the first day of the month, New Year's day. The clerk of the court, in the absence of the judge, opened court on that day, and adjourned it to the next day. On the second, the clerk opened court, and, the judge not yet appearing, adjourned it to the Monday following, January 7. On the last mentioned day, the judge still being absent, the clerk adjourned the court to the next day, the 8th, on the morning of which day the judge, being present, proceeded with the business of the term.

The provisions of section 908 of the general laws concerning adjournments of the court for non-arrival of the judge, approved December 18, 1876, are as follows: "Whenever it shall happen that the judge shall fail to reach the place appointed for holding any term of the district court by 2 o'clock in the afternoon of the first day of said term, it shall be the duty of the clerk of such court to adjourn said court until 2 o'clock of the day following; and in case the judge shall fail to arrive at the expiration of said adjournment, it shall be the duty of said clerk to adjourn the court until Monday of the ensuing week at 10 o'clock A. M. of that day."

Section 410 of the Code of Civil Procedure, adopted March 17, 1877, which took effect October 1, 1877, con-

tains the following provisions relating to the same object: "No court shall be opened, nor shall any judicial proceedings be transacted, on Sunday, New Year's day, etc., * * * except, etc. * * * When the day fixed for the opening of a court shall fall on any of the days mentioned in this section, the court shall stand adjourned until the next succeeding day. When on the day appointed for the commencement of any term of the supreme or district court, or county court, the judges or judge of such court, not being present to hold the same, the clerk of the court shall adjourn such term of court from day to day, until the expiration of one week from the day appointed for the commencement of the term. * * * And if the judges or judge of such court be not then present to hold such term on the day one week from the time appointed for such term to commence, the clerk shall adjourn the court for the term." * * *

Upon the facts stated, and under the statutes cited, counsel for plaintiff in error contend that the term lapsed by reason of non-compliance with the law by the clerk. Counsel argue that the provisions of the general law, being inconsistent with the code provisions on the same subject, were repealed by the adoption of the latter; that the clerk, in attempting to make the adjournments in conformity with the former repealed law, failed to comply with the latter, and that even if both provisions could be made to stand together there was no compliance with either, for it is contended that the fact that the first Tuesday of January fell on New Year's day, "made January 2d the first day of the term, and the adjournment then was not from the first to the second day of the term, but from the first to the sixth day of the term;" that the court did not in fact open with a judge present until one more adjournment by the clerk, from the seventh to the eighth, and that, therefore, under either statute the clerk failed to adjourn as required, and

the court thereby lapsed, so that the proceedings had subsequent to the arrival of the judge were without validity.

While it may perhaps be a possible question whether the provision in the district court act of December 18, 1876, was impliedly repealed by the subsequent code provision, since both acts were passed at the same session of the legislature, the former provision was afterwards, in the session of 1881, re-enacted *verbatim* in an act amendatory of the district court act, without reference to the existing code provision (Acts of 1881, p. 109), and the Bromwell revision, authorized by the next ensuing general assembly, in 1883, contains both provisions, now existing together, the one applying to district courts alone, the other to the supreme, district and county courts. Yet, whether the two were intended by the legislature to stand together or not, or whether it be possible for both to stand, we think the action of the court below in this case can be upheld upon other grounds. Conceding that the code provision, by reason of its prescribing a mode of adjournment differing from that under the prior statute to accomplish the same purpose, the code provision covering substantially all the provisions of the other, with the additional provision for an adjournment of the term, clearly implies a legislative intent, at the time of its adoption, to substitute an entirely new rule and one applicable to all the courts named therein, and therefore in such conflict with the previous statute on the same subject as to work a repeal thereof by clear implication; yet we think the act of the clerk in making the adjournments in question may be regarded as irregular, merely, under the code provision. These provisions are directory, and the object to be accomplished thereby is solely to prevent a lapse of the term of the court otherwise occasioned by the absence of the judge during the first week of such term. At the end of such week, if the judge be still absent, the statute makes it the duty

of the clerk to adjourn the term, and if the clerk should fail to perform that duty, we think the term would nevertheless unquestionably lapse.  But we cannot think that a lapse would result from a failure of the clerk to perform his duty in making the adjournments during the week in strict compliance with the directions of the statute, however censurable or amenable the clerk might be held for such failure of his duty, for the gist of the provision is that if the judge appear before the time for the authorized adjournment of the term, a lapse of the term is thereby avoided.

In the case of *Thomas v. Fogarty*, 19 Cal. 644, where, under a like provision of the California code, the sheriff adjourned the court from day to day for five days, and then adjourned it for the term, and the judge appeared on the eighth day, and within a week from the opening of the court, the first day, set aside such adjournment, ordered the clerk's minutes to be corrected so as to show that the last adjournment, instead of being for the term, was made to the last day of the first week of the term, and thereupon proceeded with the business of the court, this action of the court below was upheld by the supreme court on the ground that, the object of the statute being to prevent a lapse of the term, and an adjournment of the term not being authorized until the expiration of a week from the time of opening the court on the first day of the term as appointed by law, the act of the sheriff was premature, and to be treated as a nullity.

Upon the same principle, the opening of the court below in this case, by the judge, upon his appearing before the clerk had adjourned the term, and before the expiration of the time when the term would lapse without such adjournment, and the subsequent proceedings of the court, including the trial of the case before us, may be regarded as unaffected by the act of the clerk in failing to adjourn the court from day to day, each day during said week. To hold otherwise, and according to the view contended

for by counsel for plaintiff in error, that the term lapsed by reason of the neglect and failure of the clerk to strictly pursue the direction of the statute, notwithstanding that the judge arrived and opened court before the adjournment of the term, and before the time when, under the statute, an adjournment of such term was authorized, would be to bring about the very result which the statute was intended solely to prevent, namely, a lapse of the term during the first week thereof. In other words, the judge may be absent the whole of the first week without causing a lapse of the term, if he thereafter appear and open court before the authorized adjournment, or before the time when such adjournment of the term is, by the statute, authorized to be made.

Another assignment of error is that "the evidence in this case cannot sustain any higher degree of guilt than manslaughter."

As was said in the case of *The People v. Jones*, 6 Colo. 452, a case very similar to this, tried by the same court at the same term, and in which this same question was raised by the same counsel, "this was a question of fact for the jury;" and we may add, as we concluded in the Jones case, that "a careful examination of all the evidence in the case, as set out in the record, leads us to the conclusion that the evidence fairly supports the verdict."

The deceased kept a saloon in Georgetown. There were fifteen or twenty men, the plaintiff in error, May, among the number, in the saloon on the night of the homicide, and at 12 o'clock a policeman entered and told the deceased to close the house, as it was 12 o'clock. Proof was made of an ordinance of the town making it the duty of officers to close saloons at midnight. Upon this order of the officer the deceased requested the crowd to leave, as he must shut up. Deceased and May had just been having a dispute about money or the payment for some drinks, and when deceased requested May to leave the house, the latter refused, saying, as

two or three of the witnesses testified, that he wouldn't go till he "damned pleased." Deceased thereupon took him by the shoulders and shoved him out. There was quite a scuffle in getting through the door, and deceased, who was a large, strong man, thrust May out through the door into the middle of the street eight or ten feet from the saloon, the street being sixteen to twenty feet in width, at which point May stumbled or was pushed or knocked to the ground, or upon his hands and knees; the testimony is not clear as to this. Deceased then left May and walked back towards the saloon, and when eight or ten feet away May drew a jack-knife, approached deceased, and gave him one stab, the knife penetrating the heart, and causing death within an hour afterwards.

As affecting the question of malice, and whether the circumstances of the killing showed, in the language of the statute, "an abandoned and malignant heart" in the slayer, it was shown that immediately after the stabbing May walked away, and, encountering the witnesses Mitchell and Champion a few hundred feet from where the stabbing occurred, he said to the witnesses, holding up a knife in his hands, "I've been and cut the bloody heart of Richard Bonds out." Officer DeVotie, who arrested May about an hour after on the road just out of town, testified that the prisoner had a bloody jack-knife, and upon asking, "Is your name May?" he replied, "It is. I am the man that knifed the son-of-a-bitch;" and that he kept up that kind of talk all the way to the jail, but also saying that he did it in self-defense. Officer Bennett testified to the same remarks, and witness Edwards, who assisted in taking May to jail, testified that, when they were putting him in jail, McGrath came up, and calling to him by name said, "The man is dead;" at which May said, "Is the son-of-a-bitch dead?" McGrath replied, "Yes, the poor fellow is dead;" upon which May remarked, "I am damned glad of it; I don't allow any man to knock me down and put his foot to

me." Several witnesses testified that May was somewhat under the influence of liquor, but "not enough to hurt him;" that he appeared to be in his right senses, and knew what he was about.

The court gave to the jury twenty-six instructions, sixteen of which were upon the court's own motion, the other ten upon the motion of the counsel for the prisoner; and for the reason that, in my opinion, these instructions furnish in themselves better proof of their correctness, lucidity and comprehensiveness in their application to the facts of the case, and under our statutes relating to murder and manslaughter in force at that time, than could be made by any discussion of them simply with reference to the verdict complained of, they are inserted here in full, as follows:

"Court's instructions: 1. The prisoner at the bar is charged in the indictment with murder of Richard Bonds, on the 8th day of April last, in this county. Under this indictment you may find the prisoner guilty of murder as charged in the indictment, which will subject him to imprisonment in the penitentiary for and during his natural life; or you may find him guilty of murder with premeditation and deliberation, the penalty of which is death. If the evidence will not warrant a verdict of murder, you may find him guilty of manslaughter, the punishment for which offense is imprisonment in the penitentiary for a term not exceeding ten years; or, if you find the prisoner acted in necessary self-defense, you may find him not guilty. Your verdict, whatever it shall be, must be the result of a careful consideration and comparison of all the evidence before you, and an intelligent and conscientious application of the facts to the law of the case.

"2. Our statute defines these two offenses, murder and manslaughter, in the following terms: Murder is the unlawful killing of a human being in the peace of the people, with malice aforethought, either express or im-

plied.   The unlawful killing may be perpetrated by poi-. soning, sticking, starving, drowning, stabbing, shooting, or by any other of the various forms or means by which human nature may be overcome, and death thereby occasioned.   Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever.   It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection.

" 3.  The distinguishing feature between murder and manslaughter is the ingredient of malice.   Malice aforethought is as essential an ingredient of murder as the act of killing.   Malice, either expressed or implied, must be proven, and in the absence of malice such killing will be manslaughter.   Our statute thus defines ' express ' and ' implied ' malice, either of which is sufficient to constitute the crime of murder, when it exists in connection with the unlawful killing:   Express malice is that deliberate intention unlawfully to take away the life of a fellow-creature, which is manifested by external circumstances capable of proof.   Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and a malignant heart.

" 4.  To warrant a jury in finding a verdict which would impose the death penalty, they must find, and so indicate in their verdict, that the killing was with deliberation or premeditation; that is, that the prisoner conceived the intent to kill, that he meditated upon it, and that he formed and afterwards executed a deliberate determination to take life.   If a deliberate intent to kill be thus formed and acted upon, it is immaterial how soon after such evil design is formed it is executed.

" 5.  If you find from the evidence that the prisoner

intentionally killed the deceased, and that it was not done in necessary self-defense or under circumstances which justified or excused the act in law, you will then inquire whether it was done maliciously, in order to enable you to fix the grade of the offense. And if you further find that there existed in the mind of the prisoner a deliberate intention to kill the deceased, this constitutes malice aforethought, and the crime is murder; or if you find that there was no considerable provocation, or that all the circumstances of the killing show an abandoned and malignant heart, the offense is the same.

" 6. When the killing is done with a deadly weapon, or a weapon calculated to produce and actually producing death, malice may be legitimately inferred in the absence of proof that the act was done in necessary self-defense, or upon sufficient provocation or cause, and the presumption in such case will be that the act was voluntary and committed with malice aforethought. If you believe from the evidence that the deceased was required by the ordinances of the town of Georgetown to close his saloon on the night of the homicide at the hour of 12 o'clock, and that he was attempting, in good faith, to do so in compliance with said ordinances, or in obedience to the order of a police officer of said town, then the deceased had a legal right to remove all persons from his saloon for that purpose; and if the prisoner, after being requested to leave the saloon, refused, the deceased was authorized to use sufficient force to remove him, and if he used no more force than was reasonably necessary for that purpose, and thereupon the prisoner, in revenge for being so put out of the saloon, stabbed and killed the deceased, the act was murder. If, however, the deceased used greater degree of force than was necessary for the removal of the prisoner, because of the prisoner's refusal to pay for drinks obtained at the bar (if such circumstances occurred), or for other cause, and in consequence of the employment of such excessive force, and

not by the resistance of the prisoner in leaving the saloon, nor by accident, the parties were carried several feet into the street, this constitutes in law a provocation, and the question for the jury to determine will be whether the provocation was sufficient to mitigate the offense of killing.

"7. The law in relation to provocation is that no provocation will justify a man in killing another, nor will it excuse him; hence killing upon provocation will be either manslaughter or murder, according to the degree of provocation and its effect upon the person killing. To reduce the killing to manslaughter, it must have been done upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible or involuntary, and it must have been done without malice, express or implied, and without any deliberation whatever. Our statute declares that if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder. This is our statutory definition of what may be termed 'cooling time.'

"8. In determining the grade of the offense you may take into consideration all the facts and circumstances in proof attending the commission of the offense charged. And while drunkenness is no excuse for any crime or misdemeanor, unless occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of an offense, yet if it be a fact appearing in the evidence, it is to be considered by the jury in connection with all other facts in determining the degree of guilt. The fact that the prisoner was drunk, if proven, does not render his act any the less criminal, and in this sense is not available as an excuse, but upon the question whether the act was deliberate or premeditated it is proper to be considered, and only for this purpose. It

neither excuses the offense, nor avoids the punishment which the law inflicts when the character of the offense is ascertained.

"9. The provocation which will reduce a voluntary killing from the crime of murder to that of manslaughter must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. In other words, the passion must proceed from an adequate cause. If the jury find from the evidence that the prisoner refused to leave the deceased's saloon upon request, and that it became necessary to remove him in order to clear the room and close the saloon, and that he was removed for this purpose, and that no more force was used than was reasonably necessary for this purpose, then in that case the defense that the killing was in heat of blood upon provocation is not available to the prisoner because not proceeding from an adequate cause.

"10. If it should appear from the evidence that the deceased used greater force than was reasonably necessary to remove the prisoner, or that he maltreated or injured the prisoner outside of the saloon, or that the deceased violently assaulted the prisoner within the saloon on account of a dispute that had arisen as to whether the prisoner had paid for certain drinks, such assault, excessive force, maltreatment or injury forms matter of provocation, and you will then consider whether the evidence shows that such a serious and highly provoking injury was thus inflicted upon the prisoner as the law requires, to reduce the killing to manslaughter; or whether the deceased thus attempted to commit a serious personal injury upon the prisoner, which would, in law, have the same effect; and you will further consider whether such injury, if any such was inflicted, produced in the mind of the prisoner that sudden violent impulse of passion

which is supposed to be irresistible, and whether the killing was the result thereof.

"11. Material inquiries in determining these questions are: What prompted the fatal blow? Was it passion or malice? Was it an involuntary impulse or a voluntary act of the will, prompted by a desire for revenge? Did the prisoner act under great excitement, or did he act deliberately? The situation of the parties and their attitudes with respect to each other at the time of the killing, and the words spoken, if any, are to be considered with all other facts and circumstances in proof in ascertaining whether the prisoner acted from malice or passion, and in determining the character of the offense. If you find that the prisoner acted under sufficient provocation, the degree of guilt is manslaughter, otherwise murder.

"12. If you should find, from all the evidence, that the killing was in necessary self-defense, the law does not impute any crime and the prisoner will be entitled to an acquittal. The law upon this subject is: 'If a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.' If the prisoner was unlawfully assaulted by the deceased, he had a right to repel the attack, using sufficient force for that purpose, but he could not lawfully do more; and if the assault ceased before the fatal blow was struck, or if the prisoner was not reduced to such apparent extremity or danger as reasonably appeared to be absolutely necessary for the prisoner to take the life of the deceased to save his own life, or to prevent him receiving great bodily harm, then in such case you cannot find that the act was done in self-defense.

"13. The prisoner has introduced evidence of his good

character as a quiet, peaceable citizen. This evidence is proper for your consideration as any other fact in the case; but the rule of law is, that if the jury, upon consideration of all the evidence in the case, are satisfied beyond a reasonable doubt of the guilt of the prisoner, they must so find, notwithstanding his good character.

"14. The burden of proof is upon the people to establish every material fact necessary to constitute the prisoner's guilt. A mere preponderance is not sufficient to produce a conviction in a criminal case, and every one is presumed to be innocent until his guilt is made to appear. And the evidence must be of such character and weight as to produce in your minds a conviction of guilt beyond a reasonable doubt. A reasonable doubt must be an honest and conscientious difficulty in believing; it is not merely a possible doubt, but a doubt that arises out of the evidence; not a fanciful doubt nor one conjured up to escape consequences. It must be such a doubt as shakes the mind with such force as to compel it to pause in yielding belief.

"16. If the prisoner's guilt appear, from the evidence, to the exclusion of any reasonable hypothesis upon which his innocence may be maintained, you must find him guilty; if not, he must be acquitted.

"Form of verdict: If you find the defendant guilty, and also find that the homicide was deliberate and premeditated, the form of your verdict will be: We, the jury, find the defendant guilty in manner and form as he is charged in the indictment, and we find that the killing was deliberate and premeditated.

"If you find that the defendant is guilty of murder, but do not find or indicate that the killing was committed with deliberation or premeditation, the form of your verdict will be: We, the jury, find the defendant guilty in manner and form as he is charged in the indictment.

"If you find the defendant guilty of manslaughter,

the form of your verdict will be: We, the jury, find the defendant guilty of manslaughter.

"If your verdict is in favor of the defendant, its form will be: We, the jury, find the defendant not guilty. And in either case your verdict will be signed by one of your number as foreman.

"Instructions on behalf of defendant: 1. The court instructs the jury that the crime of murder requires the mind to have acted from deliberation and intelligence, and when it is clouded by a passion, apparently irresistible in a reasonable person, the killing is only manslaughter.

"2. The passion which in law rebuts the imputation of malice, so as to reduce the killing to manslaughter, need not be so overpowering as for the time to shut out knowledge and destroy volition, but that heated condition of the mind that would render a reasonable man deaf to the voice of reason, so that although the act done was likely to produce death, it was not the result of malignity of heart but imputable to human infirmity. There is no necessity that the reason should be dethroned, or that the slayer should act in a whirlwind of passion, but there must be sudden passion upon reasonable provocation, apparently sufficient to make the passion irresistible.

"3. If the jury believe from the evidence that the prisoner struck the fatal blow under a reasonable fear of receiving great bodily harm at the hands of the deceased, and that the blow was dictated by such fear, then they will find the defendant not guilty.

"4. In determining the reasonableness of such fear, the jury may take into consideration all the circumstances surrounding the defendant at the time the fatal blow was struck, as to difference in physical strength, and the like, and if the jury believe from the evidence that a reasonable person placed in the same condition as

the prisoner, and surrounded by like circumstances, would have entertained fears of great bodily harm, then the prisoner was justified in striking the fatal blow, and should be acquitted.

"5. The court instructs the jury that actual and positive danger is not indispensable to justify self-defense. If the jury believe from the evidence that the defendant was assaulted in such a way as to induce in him a reasonable and well grounded belief (and would have induced such a belief in a reasonable person) that he was actually in danger of losing his life or receiving great bodily harm, under the influence of such apprehension, he will be justified in defending himself, whether the danger was real or only apparent.

"6. The court instructs the jury that it was for the prisoner, from the appearances and the actual state of things surrounding him, to determine as to the necessity of resorting to self-defense, and if the jury believe from the evidence that Charles May stabbed Richard Bonds upon an honest belief, based upon what had immediately before occurred, and upon all the surrounding circumstances, and that he was in danger of great bodily harm, such killing is a killing in self-defense, although the jury are satisfied that in fact no real danger of the infliction of great bodily harm existed. (Our statute says that a bare fear of such danger shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge.)

"7. The court instructs the jury that a person assaulted is not bound to evade the combat or to flee, if the assault is of such a character as to render retreat impossible, or where a reasonable man, under all the circumstances, including his knowledge of the reputation or character of his assailant for violence or brutality, would be justified

in believing that flight would not save him from his assailant's violence.

"8. The court instructs the jury that the defendant has a right to decline going upon the stand, and that his refusal to testify can in no case be considered as evidence of his guilt or innocence. The law is express to this point.

"9. The court instructs the jury that if they have a reasonable doubt as to whether the defendant is guilty of manslaughter, or whether he struck the blow in self-defense, the defendant has the right to the benefit of such doubt, and the jury should acquit.

"10. The court instructs the jury that an assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

Those portions of defendant's instructions numbered five and six, which are included in parenthesis, were inserted by the court on its motion, and correctly so, notwithstanding the objections of defendant's counsel to such amendments. The eleventh instruction prayed by defendant below was refused by the court, and error is assigned to such refusal. The said instruction was as follows: "The court instructs the jury that there may be 'danger of great bodily harm' inflicted, within the meaning of those words, as used in the statute in relation to homicide, without the presence of any deadly weapon or any weapon whatever, if the physical force of the deceased were greatly disproportioned; and that the jury are not to determine whether there was, at the time of the homicide, danger of great bodily harm in fact, but whether the deceased (defendant) acted upon a reasonable belief as to danger of great bodily harm." Of the instructions given on behalf of defendant, as above set out, the third, fourth, fifth and sixth embrace fully everything contained in the one refused, which it was proper for the court to give in view of the facts before the jury.

Indeed, upon these facts, I think it may be said that the court, after the full and complete instructions given upon its own motion, put the law to as severe a strain as it was possible for it to bear, in giving the four instructions above mentioned in favor of the defendant. The testimony is clear and uncontradicted that the deceased, after pushing May into the middle of the steet, left him and walked away, going back towards the saloon, and while he was a distance of eight or ten feet away, May drew his knife, followed the deceased, and stabbed him as he turned around upon May's approach. There was therefore no danger of any kind whatever apparent to May after the deceased left him, and no ground for reasonable belief or apprehension of danger of great bodily harm. These facts may almost be said to exclude the hypothesis that the defendant acted upon a reasonable belief that such danger existed, and that hence this instruction, predicated upon such hypothesis, was calculated to mislead the jury.

Another alleged error rests upon the refusal of the court to allow the defendant to show what was the reputation of the deceased for violence in England before he came to this country. The witness Woolley had been allowed to testify as to the reputation of the deceased for " violence, physical strength and brutality " in the community where he lived, the admission of which testimony, without showing that the defendant had, prior to the homicide, any knowledge of such character or reputation of deceased, or without showing an attack upon him by deceased of a hostile character, was a more liberal ruling in favor of the defendant than he had a strict right to ask. And to claim a right to show what was the reputation of deceased in this respect in a foreign country years before, was, under the circumstances of the case, without the support of authority or reason. The seventh of defendant's instructions given was remarkably liberal

upon this point in defendant's favor. *Davidson v. The People*, 4 Colo. 145; 1 Whart. Crim. Law, sec. 141.

The other alleged errors to be considered go to the separation of the jury, and the misconduct of two of them in the use of liquor during the trial. The facts touching this question are similar to those in the Jones case. 6 Colo. 452.

On the motion for new trial in the court below, the following affidavit was filed in support of the motion: "Samuel D. Clark, being first duly sworn, on his oath states that he is acquainted with Lewis Roberts and William A. Campbell, who were two of the jurymen selected to try the defendant in the above entitled cause. That after the jury in said cause had been selected and sworn to try said cause, to wit, on the evening of the 22d day of January, A. D. 1878, he saw the said Roberts and Campbell enter the bar-room at the Barton House in Georgetown, without being in the company of any other member or members of said jury, or in company or in charge of any person or persons. That said Campbell and Roberts drank at said bar and had some conversation with the bar-keeper about said drink, and one of said jurymen procured then and there of said bar-keeper a small jug or bottle of beer." The said affiant, being brought before the court and sworn to testify touching the matter, stated: "I made the affidavit. It was my impression that it occurred on the 22d, but am not positive." On cross-examination he stated: "Cannot fix the time of the evening; could not swear that it was the same evening the jury went to the theater. Charles Damon, Wm. James and myself were behind the bar." Upon further examination by the court, the following testimony was heard upon the motion:

Officer Brownell sworn, on behalf of the motion: "Had charge of the jury; the only way jurymen could have got to the Barton House was when they went out for neces-

sary purposes; sometimes I attended them on such occasions and sometimes not; was with them at the theater. Do not know of Mr. Campbell being out of the jury room, or of his walking away from me, or of his conversing with other parties; think I was within fifty feet of all the jurymen; came from the theater among them and then we went direct to the Ennis House; did not see any jug of beer, and, with the exception of his going with Campbell to the Barton House for his overcoat, do not know of any juror going out except when they went to the water closet, when they might possibly have gone to the Barton House."

Ed. Damon, sworn on behalf of the motion: "I am clerking at the Barton House; know Mr. Campbell, but not Lewis Roberts. I was tending behind the bar on the night of the 22d at the time May was being tried. Campbell came there, I think, and shook dice; I was very busy, and don't remember his coming there with another man. William Jones and another man sat there; they asked him to come and take a drink."

Q. "Did they purchase a bottle of beer?" A. "Yes, sir."

Q. "Did they state that they were going to take it to the other members of the jury?" A. "I don't remember anything of that kind being said. Can't state the hour; spoke to Campbell in the office, and asked him what he was doing, and he told me that he was on the jury; he said that they got off to go to the show, and he got off to come up there for a moment, and were going right back. I didn't have any more to say, and went behind the bar; a few minutes after they came back and got the beer; that was all the conversation I had with them." On cross-examination, Damon states: "Would not be certain of the date; do not know whether it was before or after the jury was sworn. Officer Brownell stood at the desk when Campbell told me he was on the jury; Campbell told me they got off to go to the theater, and had to

go right back; Brownell stood at the desk; could not state whether this was before or after they went to the theater; it might have been; did not know of any other jurors there."

Wm. Jaynes, sworn on behalf of the motion: "Was at the Barton House on the evening of the 22d; know Campbell and Roberts; saw them there that evening; Campbell about 7 o'clock, and again about half-past 11; Mr. Roberts was with him at that time; Roberts was a juryman on the May case. Campbell said he got away from the officer; he did not say how; did not see any officer there; I know Brownell; he was not present that I know of; I was behind the bar, and did not go outside of the bar. They remained about five minutes; besides the drinks, they got a bottle of beer; Ed. Damon and Samuel Clark were present beside myself." Cross-examination: "I was behind the bar; could not see who was outside; don't know whether any of the rest of the jury were there or not; am clerking in Morrison & White's office."

Motion for new trial denied, and defendant excepts.

In respect to the matter of the use of liquor by the two jurors in this case, we need add nothing to what was said by this court in the Jones case hereinbefore referred to, since all that was said in the discussion of the subject in that case is equally applicable to this.

Upon the ground of the separation of the two jurors from the others in the manner shown by the testimony as set forth above, counsel for plaintiff in error argue that the judgment should be reversed. The point is but little discussed, and no authorities referred to thereon, but counsel seem to regard it as admittedly beyond question. In treating of this subject, Mr. Wharton says: "The general rule is that the verdict will not be set aside on account of inadvertent irregularity in a jury, even in a capital case, unless it be such as might affect their impartiality, or disqualify them for the exercise of their

functions. An exception, however, formerly existed in England, and is still recognized in several of the United States, in felonies, where the jury separate after the opening of the evidence. While on the one hand the present practice in England and in a portion of the American courts is to sustain the verdict when the sep-aration has been inadvertent or necessary, and no abuse has resulted from it; on the other hand, it has been con-sidered in several instances that the mere separation in itself is *prima facie* reason for a new trial." 3 Whart. Crim. Law, sec. 3283 (a).  *  *  *  "In felonies, while the English practice is to refuse to permit such separation during recesses, in the United States the practice is to permit such separation in cases less than capital. As to capital cases, there is a great diversity of opinion, but while the weight of authority is that such separation should not be permitted, there is a growing tendency towards relaxation of this rule." Id. sec. 3166 (a). See, also, Proffatt on Jury Trial, secs. 394 to 404.

We need not go further in discussion or authorities to show that there is no inflexible rule of practice binding upon courts in this regard, but that, on the contrary, a reasonable latitude is allowed to the discretion of the court in such cases, dependent upon the circumstances of the particular case, the controlling question in all such cases of misconduct of jurors being: Was the defendant prejudiced by the alleged misconduct? We do not think the misconduct of the two jurors in question in this case, however much it is to be regretted and condemned, was of such a character as should, either upon reason or authority, be held to vitiate the verdict rendered and work a reversal of the judgment. Perceiving no mate-rial error in the record, the judgment will be affirmed.

*Affirmed.*