**[No. 3916.]**

## MOORE v. THE PEOPLE.

1. HOMICIDE—EVIDENCE—THREATS.

In a prosecution for homicide threats made by defendant immediately before the killing were admissible in evidence without showing that they were directed towards the deceased, if they tend to show

a malicious condition of defendant's mind; and where it does not appear against whom the threats were made, it is for the jury to determine whether they had reference to deceased.

2. HOMICIDE—EVIDENCE — CORROBORATION OF DEFENDANT—HARM-LESS ERROR.

In a prosecution for homicide where to rebut the presumption that defendant went to deceased's place of business to seek trouble with deceased, defendant testified that he went there to meet a party who had employed him, it was error to exclude the evidence of the party he said he was to meet to the effect that he had employed defendant and that they were going to leave on the train the morning of the homicide; but where defendant was convicted of voluntary manslaughter, the element of malice was eliminated and the error was harmless.

3. HOMICIDE—MUTUAL COMBAT—SELF DEFENSE—MANSLAUGHTER.

Where one provokes a fight or voluntarily enters into one, and while engaged in mutual combat kills his opponent, he cannot avail himself of the plea of self defense, and the grade of the homicide under such circumstances, is voluntary manslaughter.

4. HOMICIDE—MURDER—MANSLAUGHTER.

Where a party is convicted of voluntary manslaughter, he cannot be heard to say that the conviction is erroneous because under the circumstances of the killing he might have been convicted of murder.

5. PRACTICE IN CRIMINAL CASES—MISCONDUCT OF JURY.

Juries impaneled in important criminal cases should not be permitted to attend public entertainments, but in the absence of a showing that defendant's rights were thereby prejudiced, a conviction will not be set aside because the jury were permitted to attend such entertainment.

6. SAME.

In a prosecution for homicide, the fact that after the jury retired to consider their verdict, certain jurors stated that defendant was guilty of killing another man several years before was not reversible error, where the foreman immediately cautioned the jury that they were to consider nothing but the evidence in the case; and it appears that the statement was not considered and had no influence in determining the verdict.

*Error to the District Court of Larimer County.*

Messrs. ROBINSON & LOVE, for plaintiff in error.

The attorney general and Mr. CALVIN E. REED, for defendant in error.

MR. JUSTICE GODDARD, delivered the opinion of the court.

The plaintiff in error was tried on an information charging him with the murder of Norman Barker, was found guilty of voluntary manslaughter, and sentenced to confinement in the penitentiary for the term of six years. To reverse this sentence, he brings the case here on error.

The homicide occurred at a saloon in Walden, where the deceased was employed as a barkeeper. On the night before the shooting, plaintiff in error was present in the saloon, at the time an altercation occurred between Barker and a man by the name of Baker; he made some remark, and deceased resented his interference, whereupon they had some words. On the following day, about half past nine o'clock A. M. plaintiff in error went to the saloon for the purpose, as he testified, of getting his overcoat and gloves, and to look for a man by the name of Webb, for whom he had engaged to work, and with whom he was going to leave town that morning.

After taking a drink with Dr. Elgin and some others, he and the doctor sat down near the stove, when Barker, who had been on duty all night and was somewhat intoxicated, came over and sat near them. Dr. Elgin, who was called for the people, gives the following version as to what then occurred:

"Norm (Barker) turned around to Ad (plaintiff in error) and said, 'What was the matter with you last night?' in a pleasant sort of way. * * * Moore dropped his chair, looked at Norm and said, 'I don't know, do you?' * * * After Ad said this, he walked toward the back door into the passage between the two rooms, and as he turned round he said to Barker, 'Come out, you son-of-a-bitch, and I'll show you what is the matter.' * * * Moore had passed on out of the passageway, and Barker followed him."

Moore's version is as follows:

"As we were sitting there, Barker came from behind the bar and sat on a chair on the other side of Elgin. He had no sooner sat down on the chair than he leaned across Elgin and says to me, ' G— D — you, what was you looking for in here last night?' He said it in a very insulting tone. * * *

I said nothing to him, got up and left the house; he got up at the same time, and followed me out; he was cursing me as he followed me. I told him to go back. He came to the door and was still cursing me, calling me a G— D—— ———— and other names of that kind."

As to what occurred afterwards, there is no controversy. In the rear of the building there was a yard extending back fifty or sixty feet, inclosed by a close board fence about six feet high. On the inside was a pile of lumber about eighteen inches high. At the corner of the saloon there was a gate-way leading out of the yard. Moore was standing at this gateway and Barker in the back door, each with his gun drawn, when Dawson, the proprietor of the saloon, came along and told them to put up their guns and stop this. Moore put his gun back. Dawson passed on; Barker then stepped outside the door, threw his gun down on Moore, who jerked his gun from his pocket, when he claims it went off accidentally. He then jumped, around the corner of the fence, going some four or five feet west, when Barker stepped upon the pile of lumber inside and leaned over the fence, pointed his gun at Moore, who was then on the outside, when Moore fired the shot that killed him.

It also appears from the evidence that Barker had several times during the morning threatened to kill Moore if he came there again; and an examination of his gun shows that it was loaded with two rim fire cartridges and three center fire cartridges. The rim fire cartridges had been snapped.

The plaintiff in error assigns and argues five propositions upon which he relies for reversal:

*First.* The admission of improper evidence.

*Second.* The exclusion of proper evidence.

*Third.* That the verdict is against the evidence.

*Fourth.* Misconduct of bailiffs.

*Fifth.* Misconduct of the jury in the jury room.

1. Upon the trial the people called as a witness J. H. Mc-Kee, who testified that on the night previous to the homicide,

and after the trouble occurred in the saloon, he overheard Moore talking with a man named Barker.

By Mr. Patton:   Q. You may state what you heard.

Defendant objects.

Mr. Patton: We expect this witness will state what he heard Moore say; we don't know positively to whom it applies; that is for the jury to say.

The Court: Does he know who spoke?

(Witness) Moore spoke. Am acquainted with Moore's voice, and also with Barker's. The voice I heard I recognized as Moore's.

The Court: In view of the altercation in the saloon that evening, and this conversation following immediately afterwards, and in view of what took place subsequently, I think I will admit it.

Exception by the defendant.

I heard Moore say he " would get the son of a bitch yet."

It is insisted that the court erred in admitting this testimony, because, standing alone, and without explanation, it was not a threat to take the life of Barker, and its only tendency was to show that defendant was a turbulent character, who entertained a disregard for human life, the only effect of which could be to prejudice the jury against him. We do not think this objection is well taken.

" Threats may be admissible, although they were not directed toward any particular person; * * * and they may not have been to commit any specific act or injury, if they tend to show a malicious condition of defendant's mind." Am. & Eng. Ency. Law, Vol. 9, p. 686, subdivision d.; *State v. Hymer*, 15 Nev. 49; *Hopkins v. Com.*, 50 Pa. St. 9.

What significance should be given to the remark, and whether it had reference to deceased, were questions properly left to the jury to determine, in connection with all the evidence in the case. *Anderson v. State*, 79 Ala. 5; *Schoolcraft v. People*, 117 Ill. 271.

2. In support of the second proposition it is claimed that the court erred in excluding the testimony of Mr. Webb, as

to the fact that he had employed plaintiff in error to work for him, and that they were going to leave on the morning of the homicide, and which was offered as corroborative of the testimony of Moore that he went to the saloon that morning for the purpose of meeting Webb. The action of the court in excluding this testimony is sought to be justified upon the ground that it was merely cumulative upon an undisputed fact that was not material to the case. While it is true that the testimony of the plaintiff in error as to his motive in going to the saloon at that time was not contradicted, and the testimony offered was cumulative upon that point, this constitutes no sufficient reason for excluding it. We know of no rule that prohibits a person on trial for a criminal offense from introducing cumulative testimony upon any fact material to the case within reasonable limits, and it is manifest that this ought not to be done when such testimony is sought to be introduced to corroborate his own statement, which, by reason of his interest in the result of the trial, may be, and often is, looked upon by the jury with some degree of suspicion. This testimony was material in that it tended to corroborate the statement of plaintiff in error that he went to the saloon for a legitimate purpose, and not, as might have been inferred, to seek trouble with the deceased. It should have been admitted. However, we do not think its exclusion constitutes reversible error, since the elements of malice, premeditation and deliberation which it would have tended to negative, were eliminated by the verdict, and the defendant consequently suffered no prejudice by reason of its rejection.

3. The next contention of counsel is, that there is no evidence to sustain a verdict of voluntary manslaughter; that the killing was either justifiable, having been done in necessary self-defense, or it was murder. It may be conceded that the record discloses no evidence that the killing was the result of a sudden heat of passion, caused by a sufficient provocation; but it does contain evidence to the effect that the defendant brought on the conflict that resulted in the killing. Dr. Elgin testifies that defendant, applying an opprobrious

epithet to deceased, invited him to come out, and he would "show him what was the matter;" and that thereupon the deceased followed him out of the saloon. If this is a true version of what occurred, it is manifest that the defendant voluntarily entered into the fight, if he did not provoke the combat; and that the killing was done during a mutual combat between him and the deceased. In such case, defendant could not avail himself of the plea that he fired the fatal shot in self-defense, and the grade of the homicide, in such circumstances, would be voluntary manslaughter. On the other hand, if they were satisfied that he sought the combat with a felonious intent, they might have found him guilty of murder; in which event, he could not be heard to say that a conviction for manslaughter is erroneous. *Murphy v. People,* 9 Colo. 435; *State v. Lindsey,* 19 Nev. 47.

As is said in *Murphy v. People, supra:*

"It is no defense to an indictment for manslaughter that the homicide alleged appears to have been committed with malice aforethought, and was, therefore, murder; but the defendant may in such case be properly convicted of the offense of manslaughter."

4. It appears that the jury, after they were impanelled, and before any evidence was introduced in the cause, were permitted by the court, under the charge of sworn bailiffs, to attend a theatrical performance. It is alleged, and attempted to be shown by the affidavit of one of the jurors, in support of a motion for a new trial upon this ground, that during the performance divers persons, not jurors, were permitted to intrude upon and occupy seats among the members of the jury; that confusion prevailed at the time the jurors were being reassembled and collected after the conclusion of the performance; that the entertainment so attended was a burlesque representation of judicial proceedings; that among the incidents introduced was one in which it was represented that a prisoner charged with stealing a jug of whiskey, was brought to the bar for trial, and the judge and court officers became intoxicated by drinking the stolen whiskey; that, in short,

the performance was a satire upon the judiciary and judicial proceedings. Counter affidavits of the bailiffs in charge of the jury were filed, to the effect that the jurors were seated in line, with one bailiff at each end of the line; that there was no improper conduct indulged in by said jurors; that they were at no time allowed to separate, and that they (the bailiffs) were constantly on watch and in touch with the jurors. Affidavits of six of the jurors were filed, of the same purport; and were further to the effect that the play had no effect upon their minds, either for or against the defendant; and that they were not influenced by witnessing it. While the practice of allowing juries impanelled in important criminal cases to attend public entertainments should not be permitted, yet, under the rule announced in former decisions of this court, in the absence of any showing that defendant's rights were thereby prejudiced, the mere fact that such indulgence was granted, is not in itself sufficient reason for setting aside the verdict. *Jones v. People*, 6 Colo. 452; *May v. People*, 8 Colo. 210; *Chestnut v. People*, 21 Colo. 512.

Conceding all that is stated in the affidavit of the juror Armstrong to have occurred, we cannot see wherein the misconduct complained of in any way prejudiced the rights of defendant. It is not to be presumed, in the absence of any showing that such was the case, that the character of the play influenced the jurors to his prejudice. We think that its tendency—if it can be presumed to have had any effect either way—was to influence them against the enforcement of law and order; and although the jurors may have come in contact with other citizens while in, or when leaving, the theater, there is no claim that they held any conversation or communication with outside parties in regard to the case, or that anything occurred which could have influenced their verdict. We do not think, therefore, that the court erred in refusing to set aside the verdict on this ground.

5. The fifth, and most serious objection urged by counsel, is based upon the alleged misconduct of the jury in the jury room. The plaintiff in error, in support of this ground of his

motion for a new trial, filed an affidavit in which he charged, on information and belief, that after the jury retired to consider the verdict, certain jurors stated to their fellows that he was guilty of having killed another man some years ago, and urged that as a circumstance to be considered in determining their verdict.

In answer to this charge, the district attorney filed affidavits of six of the jurors, including that of the foreman, who states what occurred in relation to this matter as follows:

"Any former difficulty of the defendant in this case was not mentioned to affiant's knowledge, excepting once, and that this affiant, as to the foreman of said jury, cautioned the party who mentioned the fact of said difficulty, and other members of the jury, of the injunction of the judge, that they were to consider nothing except the evidence which was adduced at the trial, and that, thereafter, no mention, to affiant's knowledge, was ever made of any former difficulty on the part of the defendant."

The affidavits of four of the jurors were, also, to the effect that the matter was mentioned but once, and immediately suppressed by the foreman; and that thereafter nothing was said in reference thereto; while one of the jurors states that he did not hear the matter mentioned. The affidavit of defendant being upon information and belief, the only positive evidence as to what occurred is that of the jurors themselves; and from what is thus shown, we must determine whether the statement of his having had a former difficulty, had any influence on the minds of the jury to his prejudice. The mention of the matter at all was, of course, improper; but we do not think that this of itself would constitute reversible error; and to have that effect, it must appear that the jurors considered it, and were influenced thereby, in arriving at their verdict. We do not think that it can be reasonably inferred that they did so, in the face of the fact that the foreman, immediately upon the subject being broached, cautioned the party mentioning it, and the other members of the jury, that they were to consider nothing except the evi-

dence that was adduced upon the trial, and the protest of several of the jurors that no outside matter was to be considered. That this caution was effective, is shown by the fact that no further mention was made of the matter.

We think, from all that appears, that the jury understood their duty and obeyed the instructions of the court, and considered only the evidence introduced upon the trial. Upon a careful examination of the record, we do not find that any error intervened upon the trial of the case that would justify a reversal of the judgment; which is accordingly affirmed.

*Affirmed.*