THE STATE v. WILLIAM JEFFRIES, Appellant.

Division Two, March 17, 1908.

1. **INFORMATION: Preliminary Hearing.** Where defendant and another have been in the same information charged as principals with a capital offense, and defendant has been given a preliminary examination, the defendant has no right to complain of the failure of the prosecuting attorney to accord the defendant's co-principal a preliminary examination according to section 2476a, Laws 1905, p. 113—said co-principal having fled and never been arrested.

2. ————: ————: **All Witnesses.** Defendant, tried upon an information, is not entitled under section 2476a, Laws 1905, p. 113, to have the State, on his preliminary examination, produce every witness it intends to call at the trial. There is need to call only so many as seem necessary to meet the purposes of an examination, namely, to satisfy the justice that a felony has been committed and to establish the probable cause for a belief on his part that defendant is guilty. The Act of 1905 must be read in connection with section 2457, R. S. 1899. The purpose of a preliminary examination is to prevent suspected persons from escaping and to secure their attendance at the trial, as well as to safeguard them from groundless and vindictive prosecutions.

3. ————: **Failure to Indorse Witnesses.** Failure of the prosecuting attorney to indorse on the information names of witnesses who had been subpoenaed before the justice at the preliminary hearing and before the circuit court for the trial, is not ground for quashing the information, but such failure is not approved.

4. **VENIRE: Summoned by Prejudiced Sheriff.** The fact that a sheriff was diligent in pursuing and arresting defendant and that he is a witness for the prosecution is no ground for holding he is so biased and prejudiced against the defendant that the *venire* summoned by him should be quashed, if the trial

State v. Jeffries.

court, upon fair investigation, finds he was not prejudiced. Besides, such motion should be made before the *venire* is summoned.

5. **EVIDENCE: Shoes Taken from Defendant: Constitutional Right.** It is not a violation of defendant's constitutional right not to be compelled to testify against himself, to permit shoes he wore at the time he was arrested to be offered in evidence and to show that they correspond to tracks found near the place of the homicide.

6. **WITNESS: Child Eight Years Old.** Where the trial court found as a fact that an eight-year-old child, who had been going to school and was in the second reader, and who answered that if she did not tell the truth she would go to the bad place, was competent to testify, its finding will not be disturbed on appeal.

7. **INFORMATION: Two Counts: Two Principals: Election.** The information in the first count charged that Hood committed the homicide and that defendant was present, aiding and abetting him, and in the second count that defendant committed the homicide and that Hood was present, aiding and assisting him. *Held*, that the court was not required to dismiss either count, nor to require the State to elect on which count it would go to the jury, but properly authorized the jury to pass upon the evidence and to find defendant guilty upon whichever count it believed the evidence sustained, and it having found him guilty under the second count no possible error could have resulted to him by the submission to the jury of the first count.

8. **IDENTIFICATION.** The identification of the defendant in this case as the murderer was sufficient to justify the verdict of guilty.

9. **JURY: Separation: Going to Theatre.** The taking of a jury to a theatre by the sheriff during the progress of the trial in a capital case, will be ground for a new trial, unless it be shown affirmatively by the State that the jurors were not subjected to improper influences.

10. ————: ————: ————: **Comic Performance.** The sheriff, during the progress of the trial in a capital case, took the jury to the opera house, to attend an entertainment consisting of comic songs and dances, there being no reference during the performance in any way to the trial of the case. The sheriff and his two deputies and every member of the jury testified that they occupied a separate section of the theatre to themselves, that they never separated and had no communication with themselves or with any other person while there or either going or returning. *Held*, that it was an irregularity, and one

State v. Jeffries.

that is to be neither countenanced nor approved, but not reversible error.

11. **ARGUMENT OF COUNSEL: No Exceptions.** Unless objections are made to the argument of the prosecuting attorney and exceptions saved to the ruling of the court thereon and the whole embodied in the bill of exceptions, there is nothing in the argument for the appellate court to consider.

Appeal from St. Charles Circuit Court.—*Hon. Jas. D. Barnett*, Judge.

AFFIRMED.

*Wilfred Jones* and *George Eigel* for appellant.

(1) The motion to quash raised three principal points of objection: (a) That Willis Hood, who is a joint defendant in this case, was informed against without his ever having been granted a preliminary examination. (b) That William Jeffries' preliminary examination was not in accordance to law. (c) That the State had purposely refrained from endorsing names of known material witnesses on the information. The defense proved all of these allegations by evidence and testimony at the hearing on the motion. Sec. 2476a, Laws 1905, p. 133. Section 2447, Revised Statutes 1899, provides that on the hearing in preliminary examinations the examining magistrate shall examine the complainant and witnesses produced in support of the prosecution, on oath. This was not done. Five witnesses were all that were endorsed upon the information, although this was the second information drawn in the case, and was drawn over nine months after the killing of deceased. That the prosecuting attorney knew of other witnesses previous to drawing the information is proven by the subpoenas made out by him for witnesses Mike Wussler, Fred Walkenhorst and Nellie Jeffries, as well as by their testimony before the coroner, which was in his hands. The testimony

of Annie Wussler, taken before the coroner, also informs him that Edna Wussler was a material witness for the State. On the stand himself, the prosecuting attorney admits that he knew of Sheriff Hines being a witness for the State, and also that he knew of other witnesses than those endorsed and might make use of them. State v. Roy, 83 Mo. 268; R. S. 1899, sec. 2517. (2) The challenge to the array of jurors was upon the ground that the sheriff, the summoning officer, on account of his bias and prejudice against the defendant and of his being a witness for the prosecution, was not the proper party to summons the jury. The jury in the case was a special venire and the officer had absolute right to summons whomsoever he pleased. Although the State sought to conceal the fact that Sheriff Hines was to be a witness, he was made use of as a witness and proved to be a material witness for the State. The defense also maintains that in the evidence adduced at the hearing on this question bias and prejudice are shown to exist in the sheriff and his officers against defendant. Objection to jurors on account of the sheriff who summons them is reached by challenge to the array. State v. Weedem, 133 Mo. 70. A sheriff who is a witness for the prosecution is disqualified to summon the jurors, on account of the bias and prejudice he is presumed to possess. State v. Powers, 136 Mo. 194; State v. Hultz, 106 Mo. 41. (3) Failure to endorse the names of all the material witnesses upon an information, if properly objected and excepted to, constitutes reversible error. R. S. 1899, sec. 2517; State v. Roy, 83 Mo. 268; State v. Grady, 84 Mo. 220; State v. Steifel, 106 Mo. 129; State v. Cole, 145 Mo. 672; State v. Nettles, 153 Mo. 464; State v. Bailey, 190 Mo. 278; State v. Barrington, 198 Mo. 124. (4) At the close of the State's case and again at the close of all of the evidence in the case, the defendant demurred to the evidence under the first count

of the information, which demurrer was by the court overruled and by the defense excepted to. There is absolutely no evidence to show that Willis Hood shot the deceased, and this first count should have been dismissed. (5) It was improper to allow in evidence all of the articles said to have been found by the sheriff and his posse. State v. Thomas, 99 Mo. 257; State v. Goddard, 162 Mo. 227. (6) The defense at once upon learning of the jury's conduct on the night of April 26th, acquainted the court with such fact, and swore to the information, at the same time requesting the jury's discharge. Thus, the court had full knowledge of it and overruled the request of defendant. (7) Improper conduct and remarks of the prosecuting attorney in making his argument to the jury constitute reversible error. State v. Elmer, 115 Mo. 401; State v. Ulrich, 110 Mo. 350; State v. Young, 97 Mo. 666; State v. Graves, 95 Mo. 510; State v Pagels, 92 Mo. 300; State v. Fisher, 124 Mo. 460; State v. Bobbst, 131 Mo. 328; State v. Barrington, 198 Mo. 132; State v. Snyder, 182 Mo. 462; State v. Gillespie, 104 Mo. App. 400; State v. Rose, 178 Mo. 25. (8) The act of the jurors in attending a public performance of a theatrical play in the public playhouse in St. Charles on the night of April 26th, which was during the course of the trial and before the State had closed its case, was first called to the court's attention on the morning of April 28th, before the convening of court, in a motion verified by affidavit, filed and called to the court's attention. Again in the motion for a new trial this act was made the 20th ground of said motion. Sheriff Hines was not in charge of the jury. They were under the charge of Deputy Sheriff Hehner. Hines was a material witness for the State, and was, also, as defendant believed and still believes, prejudiced against him. The jurors were made his guests at this evening's entertainment. It

was misconduct for the jury to attend a theatrical performance in company with an officer, even though he be the sheriff, if he was a witness for the prosecution and gave testimony in the case. State v. Snyder, 20 Kan. 306; People v. Knapp, 42 Mich. 267; State v. Bailey, 32 Kan. 84; Ganey v. People, 97 Ill. 270; Tarkington v. State, 72 Miss. 741; McElrath v. State, 2 Swan. (Tenn.) 378.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) (a) No error was committed by the court in overruling the defendant's motion to quash the information. (b) An affidavit was filed with the justice, charging the defendant with the murder of William Wussler and a preliminary examination was held. A number of witnesses testified for the State, and their testimony was reduced to writing. After hearing their evidence, the justice of the peace concluded that there was probable cause to believe that the defendant was guilty of murder in the first degree, and so found. This was a compliance with our statute, and was all that the defendant was entitled to. R. S. 1899, secs. 2457, 2461. (2) No error was committed by the court in overruling the motion to quash, because the names of certain important witnesses were not endorsed upon the information. State v. Barrington, 198 Mo. 23; State v. Myers, 198 Mo. 225; State v. Hottman, 196 Mo. 110. (3) No error was committed by the trial court in overruling defendant's challenge to the array of jurors after they had been summoned, on account of the alleged bias and prejudice of the sheriff. If the defendant desired to object to the sheriff summoning the jurors, timely motion should have been made before the *venire* had been summoned, and the defendant should not have waited until the jurors were in court. The question, however, of whether or not the

sheriff is biased or prejudiced, either for the State or for the defense, is a question peculiarly proper for the trial court to pass upon. State v. Hultz, 106 Mo. 41. (4) Counsel for defendant argue, with much earnestness, that the court erred in permitting witnesses to testify whose names had not been endorsed on the back of the information, and especially in view of the fact that some of them were material witnesses. This matter, too, has been decided recently by this court, and reference to said decisions need only be made. State v. Barrington, 198 Mo. 23; State v. Myers, 198 Mo. 225; State v. Hottman, 196 Mo. 110. (5) The trial court did not err in permitting State's witness Edna Wussler to testify, she being a child of tender years. This little girl showed remarkable intelligence, and showed that she fully understood the importance of her testimony, as well as the importance of telling the truth. R. S. 1899, sec. 4659. State v. Nelson, 172 Mo. 198; State v. Doyle, 107 Mo. 42; Rapalje on the Law of Witnesses, sec. 7. (6) No error was committed in overruling defendant's demurrer at the close of the State's evidence, and also at the close of all the evidence. The State had the right to charge the commission of a crime in several different ways, and the jury are entitled to pass upon the evidence and find the defendant guilty under whichever count the jury believe the evidence sustains a conviction. It was not error to overrule defendant's motion to require the State to elect, as both of said counts related to the same transaction. State v. Schmidt, 137, Mo. 226; State v. Houx, 109 Mo. 654; State v. Pratt, 98 Mo. 482. (7) No error was committed by the court in allowing the jury to go in company with the sheriff and attend a theatrical performance during the progress of the trial. The trial was a long one, and the jurors, no doubt, became weary during its progress. As there was a total failure of any showing of mis-

conduct on the part of the jury, or misconduct on the part of the sheriff, this assignment of error becomes immaterial. (8) The argument of the prosecuting attorney was proper and legitimate. It is true he denounced the crime which the defendant committed, denounced it in strong language, and the evidence fully justified his denunciation. A prosecutor cannot too strenuously denounce the assassination of a prominent citizen of the county by two men whose object and desire was to rob him of his money and valuables. If such conduct cannot be denounced by our prosecutors, then there is very little need of the prosecuting attorney making any argument. State v. Barrington, 198 Mo. 23; State v. Howard, 203 Mo. 604.

GANTT, J.—On the 13th of December, 1905, the prosecuting attorney of St. Charles county filed an information, duly verified, charging the defendant with the murder of William Wussler, in the said county, on the 3d day of March, 1905. The information was in two counts; the first count charged that the homicide was committed by one Willis Hood, and that the defendant, Jeffries, was present, aiding and assisting in the commission thereof; the second count charged that the homicide was committed by the defendant, and that one Willis Hood was present, aiding and assisting in the commission thereof. Both counts charged the homicide to have been committed by shooting the deceased with a pistol. At the March term, 1906, the defendant was tried and convicted of murder in the first degree. After unsuccessful motions for new trial and in arrest of judgment, the defendant was duly sentenced in accordance with the verdict and from that sentence has appealed to this court.

On the part of the State the evidence tended to prove that the deceased, William Wussler, lived in the county of St. Charles, about one mile from the city

limits of St. Charles, and about two miles from the main street in said city; that he was living there on the 3d day of March, 1905, with his family, and their dwelling house was close to the county road; the county road was called the Salt River road, and the deceased's residence was right across from the city cemetery. The family of the deceased consisted of his wife, four children, the oldest of whom was eight years of age, and his father, Mike Wussler. There was no fence separating the deceased's house from the Salt River road, which was a rock road. The entrance to the house is from the side. On the side of the house facing west, there was a small porch and three steps leading up on to the porch, and a door opened off this porch into the house. About three feet from this door there was a window in the house, which opened onto this porch. At the south end of this porch, there was a pump on the platform over the cistern. In front of the window there was a round table with a lamp sitting on it. The deceased was a milkman and a farmer.

On Thursday before the shooting, two men and two women started from Pacific, a station on the Missouri Pacific Railroad in Franklin county. The defendant lived in Franklin county, and he and a man by the name of Willis Hood and two women started from Pacific to Black Walnut, in St. Charles county, where defendant had been working and was acquainted. Black Walnut is a little village in the northern part of St. Charles county, about fifteen miles due north of St. Charles. Hood was a red-faced man with sandy hair, a little heavier set and taller than the defendant. At that time, the defendant wore a little black mustache, a black hat, very narrow brim. Of the women who accompanied the defendant and Hood from Pacific, one was his wife and the other his sister. This party of four came to St. Charles on Friday, March 3, 1905, on an electric car, between 9 and 10 o'clock in the

morning. The defendant and Hood stated before leaving Pacific, they were going to Black Walnut, where defendant had some furniture stored. They had a grip with them, a telescope grip in two parts, with three leather straps around it, and one of the women had a basket. After arriving at St. Charles the men left the grip at Mr. Farmer's, who kept a small restaurant at the foot of and a little north of the bridge in St. Charles. They were all together when they left the grip at Farmer's at about 11 o'clock a. m. A little after dinner defendant and Hood came and got the grip and took it to the M. K. & T. saloon and it remained there until they finally got it. During the day they stayed about the town, the women sitting on the railroad track and around the depot. The defendant had on a pair of blue overalls; he had on a pair of shoes number six or number seven with large brass eyelets for the shoe strings; the left shoe had a patch, a homemade patch, fastened over the left part of the sole. This patch extended some distance over the surface of the toe and large nails extended out from the surface of the soles. The defendant on that day wore a cartridge belt around his waist. He had a pair of mitts made partly of leather and partly of yarn knitting, the yarn of a green color. He had also a Colt's revolver, number 41, with side action. The revolver bore the defendant's private marks upon the handle and it belonged to him. The defendant that day bought a box of matches in a store in St. Charles, and the box had a peculiar design on it, the figure of a rose. About noon of that day, defendant and Hood pawned a watch in a pawn shop in St. Charles. The defendant had on the overalls, a little black hat, and Hood was wearing a white felt hat. Hood had a pistol, which was a 32-calibre, Smith & Wesson, old fashion, and the hammer was broken. Hood and the defendant loitered around the station house with the two women until some time

during the day, when Hood and the defendant had a
conversation; that conversation was to the effect that
they knew a man in Black Walnut who was easy pick-
ing, who had two sons, and Hood said to the defend-
ant, "We will go down to that man's and one of us
will go in and talk to the boys and get them out, while
the other one goes in and robs the house. I will get
somebody's life or fifty dollars before night." He
made this statement two or three times to the defend-
ant. It appears that the defendant and Hood had en-
gaged in a crap game with some other parties and had
lost their money and the women had asked them for
money, and Hood said to defendant and the women
that they would get money before night, they would
get fifty dollars or somebody's life. This remark was
made about one hour and a half before the shooting.
About 6 or 6:30 that afternoon, they brought the
women to the M. &. & T. station, and Hood slapped
the defendant on the shoulder and said, "Bill, you go
with me, some farmer has stole my grip, let's go and
hunt for it." The defendant and Hood then started
away together from the station, leaving the women
there, and went over to Burkholt's saloon and got the
grip. They then started out and were met about a
quarter of a mile from the deceased's house, about
fifteen minutes before the shooting. At that time, the
defendant had on a small felt hat with a very small
brim around it, but had on no coat. Hood was wear-
ing a gray hat and a coat. They were going in the di-
rection of the deceased's house. The deceased, his wife
and little daughter, Edna, were sitting by a table, which
was up against the window, already noted, and a light-
ed lamp was on the table. They heard some parties
talking on the outside and saw one man peeping in the
window. The deceased went out of the door and came
out on the porch and spoke to a man standing there
and asked what they wanted, and the smaller man, the

man with the short, black, stubby mustache, asked for a night's lodging. In the meantime, Edna, the little daughter of the deceased, came on the porch and stood by the side of her father. The deceased told the men he could not accommodate them. One of them asked to sleep in the stable, but deceased said he had no room in the stable. In the meantime, the wife of the deceased had also come out on the porch and stood by the side of her husband. The man with stubby mustache and small hat and in his shirt sleeves, stood within a foot or so of Mrs. Wussler. The little girl in the meantime had stepped off the steps and saw the other man with the grip; this man, she says, had on a gray hat and stood off a little way towards the north and nearer the county road. The short man then stepped on the porch and in a loud voice said, "If you cannot keep us here, where is Peruque station?" and the deceased answered, "That is fifteen miles up the road." The small man then asked for a drink of water, and the deceased went to the pump and got a drink of water and handed it to him, whereupon the small man pulled his pistol and pointed it at the deceased's face and said, "Money or your life." The deceased immediately, in his fright, sprung to the door, when the small man, whom the wife of the deceased identified as the defendant, shot him. The daughter of the deceased also identified the defendant as the man who did the shooting. The deceased immediately fell to the floor. Mike Wussler, the father of the deceased, heard the shot and ran out on the porch; when he got there a shot was fired at him. Then the defendant and his companion left, going in a westerly direction.

That same evening, a few minutes after the shot was fired, Mr. Schoene, who lived a short distance west from the deceased's house, heard his dogs bark. The next morning, Schoene went out to his field and found two tracks and he reported this to the officers

and they also went out and saw the tracks. One of these tracks was a number six or seven shoe, which could be plainly seen, as it had rained the day before and it was muddy. They found tracks of two men running or walking together, one was of a small shoe, a six or seven, the track showing that the left shoe had a patch on the left side. The officers traced this track to a place where they had evidently stopped and they found some clothes at that place. Among other things a pair of overalls, which were the same ones the defendant had worn that afternoon. A little further down they found a red shirt, identified as the one on the man that shot the deceased. They also found a cartridge belt, which belonged to the defendant, and which he had worn that afternoon. They also found a pair of leather mitts exactly like those the defendant had on in the town that day. A short distance further they found a box of matches corresponding in every way with the box they had purchased in the town that day. They found a pair of overshoes that the defendant said were Hood's. They found a grip with three straps around it, which was identified as the grip the defendant and Hood took to Farmer's and to Burkholt's saloon. They found a pistol, which was a 32-calibre and belonged to Willis Hood. They followed the track, which had the imprint of the patch and the nails of a shoe that corresponded with the one the defendant wore on the night of the homicide. Those tracks after they left the house of the deceased, extended up the rock road and went through a hedge fence into an orchard, and turned and went back to the city of St. Charles on the other rock road where they were lost.

The two women in the meantime were left at the M. K. & T. station. The train at that time was a little late, and defendant and Hood came running into the station together a little before ten o'clock. They were

excited and muddy. When asked where they had been, defendant said, "I have been with Hood taking care of him and he has gotten drunk on my hands." Hood pretended to be drunk and defendant was leading him. Defendant said to the station agent, "Give me four tickets to the next station." The train to Black Walnut had already gone about five o'clock that afternoon. The train that was then due was going in the opposite direction. When he asked for a ticket for the next station, the agent told him that the next station was Jefferson City and would cost him $3.12 single fare. Defendant said he did not have enough money to buy that and they left the station and proceeded up the M. K. & T. track south. After they had gone some distance, two officers saw them and searched them; having found no guns on them, the officers put them on the 11 o'clock electric car and started them towards St. Louis. All four of them got off at the next station, Pattonville; they stayed there all night, and Hood said to the defendant, "We better get rid of these women, for if we do not, both of our necks will be broken." Defendant said, "No, I am going to take my sister home," and they proceeded towards Valley Park, and were seen together there. They were apprehended by the officers and were allowed to go on their way, and they went to Pacific, where Hood left the party, and the other three went on to the home of the father of the defendant near Gray's Summit, on the Missouri Pacific, reaching there March 4th. That night and the next day the defendant Jeffries spent at his father's home. On Monday following, as his family were moving to a place near Eureka in St. Louis county, he was arrested by the officers of St. Charles and St. Louis counties, and taken first to Clayton jail and thence to St. Charles.

The defendant's pistol, a 41-calibre Colt's, had two marks on it, which the defendant himself identified and said the pistol belonged to him. He also admitted

that the belt that was found and the overalls were his and that the grip found belonged to Hood. In the grip a raincoat was found that was in it when it was left at Farmer's and Burkholt's. Along about five days after the homicide, August Ademeyer was hunting for some wild lettuce close to the waterworks and he found a pistol, a 41 Colt's, lying behind a telegraph pole on the M. K. & T. road, and at the side of it were several cartridges. This pistol was loaded and belonged to the defendant and was the one he had when he came to the city of St. Charles. The ball that entered the body of William Wussler, the deceased, and which caused his death, was a 41 Colt's cartridge.

Doctors Tainter, Mudd and Wencker were called in between seven and eight o'clock the night of the homicide to see the deceased and they treated him until his death, which was on the 5th of March, 1905. An operation was performed in hopes that the bullet could be extracted but the operation was not a success. These physicians and the coroner, who was present at the time of the operation, testified that the bullet entered to the left of the spinal column and took a course to the right and a little upwards, striking the ninth rib in the right side and severing the spinal cord. In the opinion of all the physicians the wound was necessarily fatal and was the cause of the death of the deceased. The wound was made by a 41 Colt's bullet.

The defendant's testimony tended to prove that he first became acquainted with Willis Hood on the first day of March, 1905; that previous to that time and within less than a year the defendant had worked in St. Charles county, and had gone from there to his father's home in Franklin county, remaining there the remainder of the winter. That the defendant and his wife and sister, after meeting Hood, came over to St. Charles county, and arrived in the city of St. Charles on the electric car at 11 a. m. on the 3d of March and

spent most of the day in the city of St. Charles; that
Hood was not with the defendant all the time and no
arrangement was made between them as to anything
they were going to do that day; that the defendant
intended to go to Black Walnut to get a position as
a farm hand or as a section hand and to work as he
had previously done; that he had no baggage with him
and did not have a red shirt, nor a pair of trousers, nor
a pair of mittens like those offered in evidence by the
State. He admitted that he did have a revolver, which
he sold to Hood in Pacific on the first day of March
before coming to St. Charles, and which he turned over
to Hood. The defendant claimed that the shoes that
were introduced in evidence were the only shoes that
he had and which he was wearing on the day and night
of the homicide and which he wore back at his father's
home. The Sunday morning following, so the defend-
ant testified, the repairing was done on his shoes, and
the patch was placed there which was spoken of by
the witnesses for the State. He testified he did not
know how many pairs of pants he had on the night
of the homicide; that he did not know how many shirts
he had on, but admitted that he had on the overalls
a part of the day, but said he took them off and gave
them to Hood. He admitted buying the box of matches.
The defendant's father and mother corroborated him
as to the patch on his shoe, and as to the fact that he
did not have or wear any red shirt or trousers like those
introduced in evidence by the State. The defendant de-
nied all connection with and knowledge of the homicide,
but claimed that Hood returned to the M. K. & T.
depot about nine o'clock in company with another man
and that Hood was drinking. The testimony of the de-
fendant taken at the coroner's inquest was read in evi-
dence by the State, in which he testified that he had on
four shirts that night. The State offered in evidence
also the record of the conviction of the defendant in

the Franklin Circuit Court of the crime of burglary and his sentence to three years in the penitentiary at the April term, 1899. Emil Puchta testified that he was sheriff of Franklin county and that defendant was the William Jeffries who was convicted of burglary in said county at the April term, 1899, and that he took the defendant to the penitentiary. The State also offered evidence tending to show that defendant's general reputation in the community in which he lived, for truth and veracity, was bad.

I. The information is in the form often approved by this court and is sufficient. Indeed, it is not challenged by the defendant's counsel. No error was therefore committed by the court in overruling defendant's motion to quash the same in so far as the allegations of the information itself are concerned. The motion to quash, however, assails the information on grounds *dehors* the charges in the information itself. First, it is insisted that the information should be quashed because Willis Hood, who is jointly charged with the defendant Jeffries, had never been granted a preliminary examination prior to the filing of the information against him. This contention is based upon section 2476a, Laws 1905, page 133, which provides: "No prosecuting or circuit attorney in this State shall file any information charging any person or persons with any capital offense until such person or persons shall first have been accorded the right to a preliminary examination before some justice of the peace in the county where the offense is alleged to have been committed, in accordance with article 3 of chapter 16, Revised Statutes 1899." The record in this case shows that the said Willis Hood was at the time of the filing of the information, and still is, a fugitive from justice. The Governor has offered a reward for his apprehension, and it has been renewed several times, but

the said Hood has never been found. It is too plain for discussion that the defendant has no right to complain of the failure to accord said Hood the benefit of said statute. Such failure could in no manner have presented any obstacle to the prosecution of the defendant for said offense.

Secondly, it is insisted that the defendant Jeffries was not accorded *such* a preliminary examination before the filing of the information herein as is contemplated by section 2476a, approved April 12, 1905. It is alleged in the motion to quash that the defendant was arrested and taken before the justice of the peace on the charge mentioned in the information, and the justice found there was probable cause for charging the defendant with the offense of murder and committed him to jail to answer to said charge. The contention is that on the preliminary trial only three witnesses were examined in behalf of the State in said proceedings and other witnesses who were summoned were not examined, and that for this reason the preliminary trial was not such as was intended by the Legislature. In a word, defendant insists that on the preliminary examination he is entitled to have the State produce every witness it intends to call in the prosecution and examine every one of them and unless it does so the subsequent information must be quashed. This is a misapprehension of the Act of 1905. In the absence of a statute no preliminary examination is necessary. The grand jury may indict or under our present Constitution the prosecuting attorney may file his information, and even where a preliminary examination is required, it has been held that it was unnecessary for the information to allege that the accused had had a preliminary examination or had waived it. This is not a matter which goes to the merits of the trial, but the regularity of the previous proceedings. [Washburn v. People, 10 Mich. 383; State

v. Barnett, 3 Kan. 250.] When the statute uses the term preliminary examination, it obviously refers to the well-established law of this State found in sections 2457, 2460, and 2461, Revised Statutes 1899, which provide that if the justice shall be satisfied that a felony has been committed and there is probable cause to believe the prisoner guilty thereof, the magistrate shall commit him to jail or admit him to bail for trial upon the charge. The magistrate is not charged with, or empowered to determine the guilt or innocence of the accused. All that he is required to find is that a felony has been committed and probable cause to believe the prisoner guilty thereof. The preliminary examination after all is but an expedient to prevent a suspected person from escaping and to preserve the evidence and keep the witnesses within the control of the State. It is to be remembered that these preliminary proceedings are generally required to be held before justices of the peace, officers not learned in the law, and the same fullness and precision, the same precaution against all of the contingencies of the testimony required in the trial of the cause in the circuit or criminal courts upon informations or indictments, were never intended. The Act of 1905 was in all probability intended as a safeguard against groundless or vindictive prosecutions, which it was supposed might otherwise occur where the interposition of the grand jury was dispensed with. But it must, in our opinion, be read in connection with section 2457, Revised Statutes 1899, which provided not for a trial in which the guilt or innocence of the accused should be finally determined, but as already said, was intended to prevent suspected persons from escaping and to secure their presence for a trial after indicted by the grand jury or upon an information filed by the prosecuting attorney. The statute simply requires that the justice shall be satisfied that the offense has been com-

mitted and probable cause that the accused is guilty of the offense. It was, in our oipnion, never intended that the judgment of the circuit or criminal court or a jury on a plea in abatement should be substituted for that of the examining magistrate as to whether there was or was not probable cause for believing the accused was guilty of the offense before he could be held to answer to the indictment or information. The record in this case discloses that the defendant had a preliminary examination and the justice found that a murder had been committed and there was probable cause to believe that the defendant was guilty of the offense. The fact that other witnesses had been summoned before the justice and were not examined, in our opinion, did not affect the finding of the justice that there was probable cause upon the evidence adduced before him. He was the sole judge at that time of the sufficiency of the evidence to satisfy him that there was probable cause to hold the defendant to answer to an indictment or information. Accordingly, we hold that there was no error in refusing to quash the information, either on the motion to quash or on the plea in abatement, which tendered the same issue to the court.

Having reached this conclusion, we are not inclined to enter upon a consideration of the proposition advanced by the Attorney-General that the Act of 1905 is unconstitutional on the ground that it is an unwarranted interference with the prerogative of the prosecuting attorney under the Constitution to file an information in the absence of a preliminary examination. Much can be said upon each side of that proposition, and in a number of states the right of the Legislature to insist upon a preliminary examination as a condition precedent to the filing of an information by the prosecuting attorney has been sustained, notably in Michigan and Kansas.

210 Sup—21

Thirdly, it is insisted that the motion to quash should have been sustained because the names of Fred Walkenhorst, Nellie Jeffries and Mike Wussler were not endorsed upon the information. It appears that the names of these witnesses had not been endorsed upon the information at the time the motion was filed and passed upon by the court. But it also appears that these witnesses had been summoned before the justice of the peace on the preliminary examination and before the coroner, and had been subpoenaed for the State for the trial of this cause in the circuit court, and the defendant was fully advised that they had been so summoned, and the prosecuting attorney testified that the names of those endorsed upon the information were the main witnesses that he knew anything about at the time he drew the information. We have so recently reviewed the statute on this subject, section 2517, Revised Statutes 1899, that it is unnecessary to repeat what has been said in State v. Barrington, 198 Mo. 23; State v. Myers, 198 Mo. 225, and State v. Hottman, 196 Mo. 110. In our opinion, there was no error in refusing to quash the information on this ground. But we are not to be understood as approving the failure of the prosecuting attorneys in not endorsing the witnesses on either indictments or informations.

The statute provides that the names of the witnesses shall be endorsed, and no fair-minded prosecuting attorney ought to deprive the defendant of the benefit which this statute gives him. It was enacted for a wise and beneficent purpose, and prosecuting attorneys ought to observe it so that this question would not so often be urged in this court. And the circuit courts should require it to be done whenever a motion to quash or complaint is made on that ground. It was ruled as early as State v. Patterson, 73 Mo. 695, that it was competent for the court to permit the names of

the witnesses to be endorsed pending a motion to quash. And we may add, in our opinion, it is perfectly competent to require it to be done.

II.  It is next insisted that the court erred in refusing to quash the *venire* upon the ground that the sheriff, who summoned the panel, was biased and prejudiced against the defendant, and being a witness for the prosecution, was not the proper party to summon the jury.  The court heard the evidence on this question, and held that the sheriff was not disqualified. The mere fact that the sheriff exercised all due diligence in pursuing and arresting the defendant after suspicion was directed to him, was no ground for alleging that the sheriff was prejudiced.  In State v. Hultz, 106 Mo. 1. c. 49, it was observed that "a duly chosen officer ought not to be deprived of his office save and for the gravest reason.  This is true because the people have reserved to themselves the right to name their officers, and have not, save in exceptional cases, left to any one man the power to select them. . . .  And when a citizen is to be deprived of his life or liberty, one of his safeguards is that it can be done only by an officer duly elected, and who is under the obligation of his oath of office and a sense of responsibility to the public which elected him. . . .  The statute does not prescribe how the court shall ascertain the prejudice of the sheriff, but it is left to the discretion of the court in what form the evidence shall be presented, and of course it is for the court to say when it is satisfied.  This investigation the law has confided to the circuit judge.  Of course, his action is subject to review, if it shall appear arbitrary and unjust."  In this instance we see nothing that smacks of a want of a wise discretion in refusing to set aside the panel on account of the prejudice of the sheriff.  Moreover, if the defendant desired to object to the sheriff summon-

ing the jurors, a timely motion should have been made before the *venire* had been summoned and he should not have waited until the jurors were in court.

III.   Counsel urges that it was error in the circuit court to permit witnesses to testify whose names had not been indorsed on the back of the information.   As we have already reached the conclusion that the failure to indorse these names of the witnesses on the information did not constitute reversible error, it follows that this objection is not tenable, as the statute itself expressly provides that other witnesses may be called and examined.   [State v. Barrington, 198 Mo. 23; State v. Myers, 198 Mo. 225; State v. Hottman, 196 Mo. 110.]

IV.   Error is assigned in regard to the admission of testimony as to tracks or foot-prints found in the soft mud in the orchard near the deceased's home, and that one of said foot-prints corresponded with one of the shoes worn by the defendant on the night of the homicide.   The ground of this objection seems to be that the foot-prints were found one-half mile from the scene of the crime, and that there was no evidence as to when they were made.   This is a clear misapprehension of the evidence.   The tracks were traced from the deceased's house up the rock road and through a hedge fence into an orchard, and it was by following these tracks that the articles of apparel belonging to the defendant were found and the size of the track corresponded with the size of the defendant's shoe, especially that portion of his shoe which had the heavy home-made patch upon it.   Moreover, the evidence was that it had rained the night before and there was no trouble to discover that they were fresh foot-prints. We think there can be no doubt whatever of the competency and admissibility of this evidence when taken

in connection with the testimony of the witness Schoene as to the barking of his dogs that night after the shooting or after the shot was fired that killed the deceased. This evidence was not only competent, but very damaging indeed when taken in connection with the other circumstances as to the finding of the overalls and the red shirt and the cartridge belt which had been worn by the defendant the day of the homicide in St. Charles. It is also objected that the court erred in permitting the witnesses to testify to the finding of the Colt's revolver, calibre 41, near the same place. This evidence was also exceedingly pertinent. The defendant himself stated that this pistol had formerly belonged to him and he identified it by the two notches on it, and said that he had disposed of it to his companion Hood, who was jointly charged with him in the information.

It is also assigned as error that the court permitted the shoes that the defendant wore at the time he was arrested to be offered in evidence, on the ground that it violated the defendant's constitutional right not to be compelled to testify against himself. This subject was examined and considered in State v. Pomeroy, 130 Mo. 489, and it was held in that case that the introduction of lottery tickets, papers, etc., taken from the person of the defendant and from his desk and introduced in evidence over his objection, was not a violation of section 23 of article 2 of the Constitution of this State, providing: "That no person shall be compelled to testify against himself in a criminal case." [Following Com. v. Dana, 2 Metc. (Mass.) 329; 1 Greenleaf's Evidence (14 Ed.), sec. 254a; State v. Flynn, 36 N. H. 64; Siebert v. People, 143 Ill. 571; Gindrat v. People, 138 Ill. 103.] Moreover, in this case, we have been unable to find any evidence that these shoes were taken from the defendant, but, in our opinion, it is

immaterial how they were obtained, because the author-
ities all hold that it was competent to introduce them.

Another objection to testimony is that the wit-
ness Edna Wussler was an incompetent witness, owing
to her age and lack of understanding. Before per-
mitting this little girl to testify, the court heard evi-
dence as to her competency. It appeared that she was
eight years old and that she had been going to school
and was in the second reader. She had been taught to
say her prayers, and she answered to the court that
if she did not tell the truth she would go to the bad
place. After a full examination, the court decided to
admit her testimony. In State v. Scanlan, 58 Mo. 204,
this subject was examined by this court, and Judge
LEWIS, speaking for the court, said: "The capacity
or incapacity of a child as a witness in certain essential
particulars was a question of fact which the judge
determined upon personal inspection and oral exam-
ination. If any principle of law had been declared
by him—as that, although found incapable of discrim-
inating between truth and falsehood, the law made her,
nevertheless, a competent witness—that might well be
brought here for review. But I can find no case in
which it is held proper for an appellate court to review
the finding of fact. The contrary rule is declared by
all respectable authorities. No hardship necessarily
results; for, if the judge should chance to err in his
conclusion, the jury hold a powerful corrective in their
right to pass upon the credibility of the witness, as
tested on the stand by the usual appliances." Our
statute, section 4659, Revised Statutes 1899, excludes,
simply, "a child under ten years of age, who appears
incapable of receiving just impressions of the facts
respecting which they are examined, or of relating
them truly." In State v. Nelson, 132 Mo. 198, it was
said by this court: "It is not unusual to receive the
testimony of children under nine, and sometimes under

seven, years of age, if they appear to be of sufficient understanding; and it has been admitted even at the age of five years. [1 Greenleaf's Ev. (14 Ed.), sec. 367.] Indeed, there is no precise age at which children are competent or incompetent. Their competency is to be determined by their apparent capacity. It belongs to the judge in each case to determine by appropriate questions the competency of the infant offered as a witness, and his decision is not open to review unless there be a clear abuse of judicial discretion, or the witness be admitted or rejected upon an erroneous view of a legal principle. [State v. Scanlan, 58 Mo. 204; State v. Doyle, 107 Mo. l. c. 42.]'' After reading the testimony of the child and the examination which the court gave her, we are of the opinion no error was committed in permitting her to testify.

V. It is insisted that the court should have required the State to dismiss as to the first count of the information on the ground that the evidence established that Willis Hood did not shoot the deceased as charged in that count. There was no error in this. The State had the right to charge the commission of the crime in different ways and the jury were entitled to pass upon the evidence and find the defendant guilty under whichever count the jury believed the evidence sustained. [State v. Schmidt, 137 Mo. 266; State v. Houx, 109 Mo. 654; State v. Pratt, 98 Mo. 482.] As the defendant was not convicted of assisting Willis Hood in killing the deceased, but on the ground that he fired the fatal shot himself, no possible error could have resulted to him by reason of the submission of the other count to the jury. The defendant would have been equally guilty had the jury found that Hood fired the shot and the defendant was present aiding and assisting Hood in the attempt to perpetrate a robbery and in the commission of the murder. It is too plain

for discussion that the circuit court committed no error in refusing to instruct the jury to acquit the defendant at the close of the evidence in the case. The State was not required to elect on which count it would proceed, nor to enter a *nolle* as to the first count.

VI. It is next urged that there was no such identification of the defendant Jeffries as would justify the verdict of the jury. With this contention we cannot agree. Not only was the defendant identified by Mrs. Wussler, the wife of the deceased, and Edna Wussler, his daughter, but the incriminating circumstances strongly corroborated by the admissions and statements of the defendant himself all point to his guilty participation in the murder of William Wussler. His association with Willis Hood in St. Charles on the day of the homicide, and the fact that after that the two were seen within a quarter of a mile of the residence of the deceased only a few minutes before the homicide, and going in that direction; the various articles of his clothing that were found near the home of the deceased, and the tracks that were found in the soft ground near the residence of the deceased corresponding exactly with his own foot and shoe; the fact that the deceased was killed with a bullet out of a 41-calibre pistol, the fact of the finding of that pistol on the route taken by the defendant after the homicide, his identification of it as a pistol that he had owned, and by some of the witnesses as his own property, the threats of his companion Willis Hood that they would get fifty dollars or kill some one that night, their flight and attempted flight from St. Charles, the sudden change of his announced plan to go to Black Walnut, and instead, attempting to go after the shooting in the opposite direction, established a case which fully justified the jury in finding him guilty of the offense charged against him. While the defendant attempted to ex-

plain the criminating circumstances against him, it is
clear the jury did not accept his explanations, and in
view of the fact that he had been impeached as a wit-
ness, it is not strange that the jury disregarded his
evidence. We think there was ample evidence tending
to identify the defendant as the person who shot and
killed. William Wussler, and to justify the finding of
the jury.

VII. Again, it is insisted that error was com-
mitted in allowing the various articles of apparel found
by the sheriff and the other witnesses and identified
as the property of the defendant, in evidence. We
think there is no merit in this objection when it is con-
sidered that the defendant and Hood left the station
together and went to Burkholt's saloon and got the grip
and were seen going off together not over an hour
before the homicide was committed, and that one of
the two men who shot and killed William Wussler stood
in the yard with the grip in his hand at the time of
the shooting, and that the two fled together and their
tracks led through the orchard up to and beyond where
these articles, which defendant admitted were his own,
and which were otherwise shown to have been worn
by him that afternoon, were found. It was incriminat-
ing evidence of a most persuasive character showing
his presence at the homicide. Nothing said in State
v. Thomas, 99 Mo. l. c. 257, 258, or in State v. Goddard,
162 Mo. l. c. 227, is opposed to this view. In neither
of those cases did the evidence of the clothing show any
connection with the defendant or ownership by him,
whereas in this case his ownership of these articles
was shown beyond a reasonable doubt.

VIII. Error is predicated upon the fact that on
the night of the 26th of April, during the progress of
the trial of said cause, the sheriff, with two of his

deputies, took the jury together to a public performance in the opera house in the city of St. Charles, and the defendant brought this matter to the attention of the court, and requested the discharge of the panel of jurors and summons for a new panel. On the part of the State it was shown by the sheriff and his two deputies, Hehner and Mades, that they did take the jury to a minstrel performance in the opera house of St. Charles on the night mentioned. The sheriff and his two deputies and every member of the jury testified that they sat in a section to themselves and no member of the jury had any communication with any person or persons during the said performance, nor was any member of the said jury, or the said jury at any time, in going and returning from the said performance, subjected to any outside influence whatever; that the entertainment was simply a song and dance affair consisting wholly of comic songs and dances, and there was no reference of any nature to the trial of the case in any way. A program of the entertainment is incorporated in the record and consists entirely of comic and sentimental songs with an occasional dance to relieve the tedium. This motion the court overruled, and as already said this action of the sheriff is assigned as error. The irregularity in this case occurred before the conclusion of the trial and before the jury had finally been charged with the fate of the prisoner. That it was an irregularity and improper for the sheriff to have taken the jury to the opera house after they had been selected and sworn to try the case, we take it that there can be little difference of opinion. From time immemorial it has been a part of our system of criminal trials under the common law in all capital cases to sequester the jury from the rest of the community, and our statute accentuates this principle. It is not a matter of insubstantial form, but one of the means provided by the law to have the verdict of the

jury founded entirely upon the law and the evidence in the case uninfluenced by outside opinions. The original common law rule was based upon the theory that the jury should be kept while the trial was progressing under the eye of the court, or what was in legal effect the same thing, under the eye of the officers of the court. When, therefore, criminal trials became the business of several days, it was deemed no deflection of the original rule to place the jury in charge of a sworn officer of the court with instructions not to permit any communication between the jury and other persons in regard to the case on trial. Thus, in The King v. Stone, 6 Tr. Rep. 527, the trial having lasted more than one day, Lord KENYON, who presided, permitted the jury to retire to an adjoining tavern where accommodations were prepared for them, the bailiffs being sworn "well and truly to keep the jury and neither speak to them themselves nor suffer any other person to speak to them touching any matter relative to the trial." Our statute evidently had its origin in this principle indicated by the action of Lord KENYON in that case.

In State v. Orrick, 106 Mo. l. c. 125, it was said by this court: "The rule was followed in this State for many years that the separation of a jury, in a criminal case, was not sufficient to authorize a reversal of a judgment, unless it appeared that improper influence had been exerted, or there was just ground for suspecting such influence. The history of the administration of the criminal law demonstrates that during the time it was followed, granting new trials was a common occurrence upon this ground, and a conviction was seldom obtained that was not attacked on the ground that the jury had been permitted to separate, and, during such separation, improper influences had been exerted over them. [Whitney v. State, 8 Mo. 165; State v. Mix, 15 Mo. 153; State v. Barton, 19 Mo. 227;

State v. Igo, 21 Mo. 459; State v. Carlisle, 57 Mo. 102; State v. Brannon, 45 Mo. 330; State v. Bell, 70 Mo. 633.] Under the revision of 1879 three new sections on this subject were adopted, sections 1909, 1910 and 1966, Revised Statutes 1879 (now secs. 2628, 2629 and 2688, R. S. 1899). These new sections were evidently designed to effect some change in the conduct of criminal trials. Section 1909 so far as it affects the trial of capital cases was but declaratory of the common law, which forbade the separation of the jury during the trial in all felony cases. [1 Bish. Crim. Proc., sec. 995.] In so far as said section authorized the separation of the jury in felony cases other than those made capital by the statute, it effected a relaxation of the common-law rule to the extent of permitting a separation of the jury by the consent of the parties. If this section stood alone no such change in the statute could be seen as would require any change of the practice in respect to the separation of the jury, or the rule, above mentioned, requiring suspicion of improper influences upon the jury before a verdict would be set aside on account of a separation. It is not so, however, in regard to sections 1910 and 1966. These were evidently intended to effect a radical change in the previous law and practice; yet it will be observed that these sections, by their express terms, only apply to the conduct of juries after they retire, under the charge of a sworn officer, to deliberate upon their verdict. From that time until their final discharge the law is imperative that they shall be kept together. A failure to observe the requirements of section 1910 will be cause for a new trial under section 1966. These sections are held to be mandatory to the extent, at least, of preventing any opportunity for misconduct on the part of the jurors, or suspicion of improper influences upon them. [State v. Collins, 81 Mo. 652; State v. Murray, 91 Mo. 95; State v. Woodward, 95 Mo. 129; State v. Rush,

95 Mo. 204; State v. Gray, 100 Mo. 524; State v. Witten, 100 Mo. 527.]'' Accordingly, the conclusion was reached in that case that a separation of the jury before they retired to deliberate on their verdict, will be a ground for a new trial, unless it be shown affirmatively by the State that the jurors were not subjected to improper influence. In this case there was no separation of the jury, but in our opinion, a like principle should obtain, the case being a capital one.

What irregularity on the part of the officer will require a new trial has been discussed in a number of cases. In 17 Am. and Eng. Ency. Law (2 Ed.), 1202, it was said: ''It is not improper for an officer in charge to take the jury for a walk, provided proper precautions are taken that no communication with outsiders takes place; nor is it a ground for new trial that such walk extend beyond the limits of the county or even of the State. . . . Nor will the verdict be set aside because the officer took the jurors to a theatrical performance involving a burlesque of judicial proceedings, or because they were taken to church and there heard a sermon applicable to the case on trial, such application not being intended.''

In Moore v. People, 26 Colo. 213, it appeared that the jury after they were impanelled but before any evidence was introduced in the case, were permitted by the court under the charge of sworn bailiffs to attend a theatrical performance; it was alleged and attempted to be shown by the affidavit of one of the jurors in support of the motion for new trial upon this ground, that during the performance divers persons, not jurors, were permitted to intrude upon and occupy seats among the members of the jury; that confusion prevailed at the time the jurors were being reassembled and collected after the conclusion of the performance; that the entertainment they attended was a burlesque representation of judicial proceedings; that in short

the performance was a satire upon the judiciary and judicial proceedings. Counter-affidavits of the bailiffs in charge of the jury were filed to the effect that the jurors were seated in line with one bailiff at each end of the line; that there was no improper conduct indulged in by said jurors; that they were at no time allowed to separate, and that the bailiffs were constantly on watch and in touch with the jurors. Affidavits of six of the jurors were filed of the same purport, and were further to the effect that the play had no effect upon their minds, either for or against the defendant, and that they were not influenced by witnessing it. Upon this state of facts the Supreme Court said: "While the practice of allowing jurors impaneled in important criminal cases to attend public entertainments should not be permitted, yet, under the rule announced in former decisions in this court, in the absence of any showing that defendant's rights were thereby prejudiced, the mere fact that such indulgence was granted, is not in itself sufficient reason for setting aside the verdict. [Jones v. People, 6 Colo. 452; May v. People, 8 Colo. 210; Chesnut v. People, 21 Colo. 512.]" And it was held that it was no error to refuse to set aside the verdict under the circumstances.

In Jones v. People, 6 Colo. l. c. 463, it appeared from the testimony of the officer in charge of the jury, as well as every member of the jury, that the entire jury in charge of a sworn officer of the court attended a theatrical play at a hall or opera house in Georgetown where the court was sitting; that they occupied seats especially engaged for them in a body; that no one occupied these seats but the jurors and the officer in charge; that they did not separate either while there or in going to and from the place and had no conversation or communication with any one except between themselves and the officer; that no other spectators at the theatre mingled with them; that they were

all the time while there, as well as while going and coming, in charge of said officer, and that they so attended the theatre by permission of the judge trying the case. These facts were not contradicted in any part. In that case the record was silent as to the literary or moral character of the play, whether tragical, comic or sentimental, and it was held that where it does not appear that the acts complained of have affected the jury in the full and impartial discharge of their duties in trying the case, there was no sufficient cause for holding the verdict thereby vitiated, or for setting it aside. The court said: "We are not to be understood as approving the practice of an indulgence to jurors, such as were granted here; on the contrary, such a relaxation, as a rule, is not to be countenanced; but in this particular instance . . . since it appears to have been harmless, we cannot hold that there was error in the refusal of the court to set aside the verdict on this ground." That was a case of murder with a sentence of imprisonment for life.

The facts of this last-cited case are in all respects similar to the one before us for review. In this case the three officers in charge of the jury and every member of the jury testified that they occupied a separate section of the theatre by themselves; that they were never separated and had no communication either going or coming from the opera house, or while there, or at any other time with any person outside of their number. Neither is it charged in the affidavit that they did so and their evidence was wholly uncontradicted on this subject. While we think it was an irregularity that is not to be countenanced or approved, in view of the uncontradicted testimony on the subject showing the performance, a copy of the program of which is included in the record, to have been nothing more than a minstrel performance consisting of sentimental and comic songs, we are constrained to hold

that the circuit court did not err in refusing to set aside the verdict on this ground.

IX.   Finally, it is insisted that the remarks of the prosecuting attorney in his argument to the jury constituted error for which this judgment should be reversed.   We have read what appears to be a full report of the prosecuting attorney's argument, both in opening and closing the case.   Among other things he said: "'When the two murderers went up the road that night to that man's house, they were going to get money or his life blood.   They were preparing for a crime not conceiveable in the heart of a man born of a woman but of a fiend from hell."   To this statement Mr. Jones, counsel for the defendant, objected on the ground that it was improper argument and misconduct on the part of the prosecuting attorney.   The court made no ruling on the matter and no exception was saved and the counsel proceeded with his argument.   In discussing the testimony the prosecuting attorney said, "Mrs. Wussler, the woman you made a widow, said she recognized you by the scar you now bear upon your face. She recognized you from the stubby mustache.   She recognized you by the shirt found by the officers, the red shirt you had on, and by the pants she positively identified."   At this point the counsel for the defendant said, "I object to the actions of the prosecuting attorney in shaking his fist at the defendant, and I want that shown in the record."   The prosecuting attorney replied, "I do not want this taken out of my time."   Counsel for the defendant, "I want the gestures and approaching the defendant and shaking his fist at him to go into the record."   Thereupon, the court ordered the prosecuting attorney not to direct his argument to the defendant in person.   No exception was taken and the court was not notified that his rebuke or reproof was not sufficiently severe.   Again, in the

course of his argument the prosecuting attorney was discussing the evidence given by the defendant on the stand and said: "I asked him, 'What did you do the first thing after you got to town?' and he commenced to laugh in a sneering way, you saw it, laughing when his life was at stake, laughing when a man's life is at stake, trying to vindicate himself for a murder. He laughed in a sneering way when I asked him what is the first thing he did when he came to town and he said, 'I guess the first thing we did was to hunt up a saloon.'" Objected to by counsel for the defendant as improper argument. The objection was overruled and exceptions saved. Thus it appears that of the objections made by the counsel for the defendant to the argument of the prosecuting attorney the court rebuked the prosecuting attorney and directed him not to make his argument to the defendant but to the jury. As to the first objection noted, he saved no exception whatever and obtained no ruling from the court, the only exception saved was to the argument for the counsel for the State in his criticism of the manner of the defendant in testifying, his laughing in a sneering way when asked as to what he did when he first came to St. Charles that day. We have read the whole address, and we agree with the learned circuit court that there is nothing out of the way in this criticism of the defendant's manner of testifying. It has been so often ruled that if counsel use objectionable argument or make statements not authorized by the testimony on the facts in the case, it is the duty of the opposing counsel to object to the court and if the court overrules their objections to save an exception thereto and incorporate the same in their bill of exceptions, that a citation of the cases is deemed entirely unnecessary. It follows that this last assignment furnishes no ground for a reversal of the sentence in this case.

The record in this case is very voluminous, but we have gone through it with a purpose to discover whether the defendant has been deprived of that fair and impartial trial to which he is entitled under the law, and have weighed and considered the evidence and all the propositions advanced by his able and industrious counsel and have been unable to find any reversible error in the record, and have reached the conclusion that the evidence in the case fully warranted the verdict of the jury. The judgment of the circuit court must, therefore, be affirmed, and the sentence which the law pronounces is directed to be carried into execution.

*Fox, P. J.,* and *Burgess, J.,* concur.